16207

KNIGHT *ET AL.* v. STROUD *ET AL.*
(53 S. E. (2d) 72)

438

*Messrs. James E. Leppard* and *Wm. P. Gulledge,* of Chesterfield, *for Appellants,* cite:

*Mr. George K. Laney,* of Chesterfield, *for Respondents,* cites:

April 15, 1949.

BAKER, Chief Justice.

This is the second appeal in this case. The opinion in the first appeal is reported in 212 S. C. 39, 46 S. E. (2d) 169, 170; and merely settled that the defense of the respondents here (defendants) was "a purely equitable defense in the nature of an equitable estoppel, and should be referred or tried by the court as an equitable issue."

The complaint of the appellants, as executors of the last will and testament of W. S. Huggins, deceased, alleges that at the time of the death of the testator, on October 20, 1944, he was seized in fee and in the lawful possession of a tract of land situate in Chesterfield County, South Carolina, containing two hundred and twenty-one (221) acres; that since the death of the testator, the respondents entered into the possession of said land, and have since withheld the possession thereof from the appellants, who, under the terms of the Will of the said W. S. Huggins, deceased, are required to sell same and to distribute the proceeds of such sale as therein directed.

The answer of the respondents set up a claim that W. S. Huggins in his lifetime made a parol gift of sixty (60) acres of this two hundred and twenty-one (221) acre tract of land to the respondent, Nealie Stroud, who, it is alleged is the daughter of W. S. Huggins, and that she was in the possession of the same as owner before and at the time of the date of the Will of W. S. Huggins, and before and at the time of his death; and that W. S. Huggins put her in the possession where she and her family have continuously resided thereon since she was placed in possession.

The issue raised by the answer of the respondent, Nealie Stroud, was referred to the Master for Chesterfield County to take and report the testimony. (It was from this order of reference that the first appeal was prosecuted.)

The Master, in due time, took, and reported the testimony to the Court of Common Pleas; and the Honorable J. Woodrow Lewis, Circuit Judge, after studying the testimony, and hearing arguments 'of counsel, held in effect: (1) That W. S. Huggins made a parol gift of sixty (60) acres of the two hundred and twenty-one (221) acres of land to the respondent, Nealie Stroud. (2) That during the life of W. S. Huggins, and relying upon the parol gift, the respondent, Nealie Stroud, made substantial and valuable permanent improvements on the sixty (60) acres of land. (3) That the respondent, Nealie Stroud, was placed and remained in the possession of the sixty (60) acres of land under the parol gift. (4) That the making of substantial and valuable permanent improvements upon the said sixty (60) acres of the tract of land involved, after the alleged parol gift thereof and during the life of W. S. Huggins, took the alleged parol gift of said land out of the operation of the Statute of Frauds. (5) That the respondent, Nealie Stroud, is the owner of sixty (60) acres of the two hundred and twenty-one (221) acre tract of land here involved. (If W. S. Huggins conveyed to his son, Brooks Huggins, 116 acres of the original tract of land conveyed to W. S. Huggins by Anna M. Williamson *et al.,* then the tract of land out of which it is sought to carve 60 acres, contains not 221 acres, as all parties to this action have treated it, and as did W. S. Huggins in making his Will, but only 211.62 acres. However, this is immaterial to a decision of the issues.)

It is from such holdings of Judge Lewis in his order dated July 14, 1948, that this appeal is here; and to pass upon the issues raised by the appeal, we will have to summarize the testimony. But prior to entering upon a statement and discussion of the facts, the law applicable to the establishment

of a parol gift of land and the enforcement of such parol gift in a Court of Equity should be stated.

A parol gift of land can be established only by clear and convincing testimony, and unless possession of the land is delivered or taken *in pursuance of the gift* thereby taking such parol gift out of the statute of frauds, evidence of the parol gift is inadmissible.

Even as to personal property, to constitute a gift, there must be an actual or constructive delivery of possession, so as to confer a right of present enjoyment. "If the donor delivers a chattel to one, to be taken possession of a year hence; this is nothing more than a voluntary undertaking to give it at that time, and cannot be enforced either as a gift, or as a contract." There can be no such thing as a parol gift commencing *in futuro*. *Pitts v. Mangum,* 2 Bailey 588.

Quoting from *Caldwell, Executor, v. Williams et al.,* Bailey's Eq., 175: "It is hardly necessary to say, that a parol gift of land transfers no right. In general, evidence of such gift is not admissible, although it has been received, in particular cases, to shew the character of the subsequent possession. Then, regarding it as an agreement to convey, which is sought to be enforced on the ground of part performance, no agreement can be enforced, either in law, or in equity, which is not founded on a consideration. * * *"

The prevailing doctrine, and the applicable law of this State, is stated as the general law in 24 Am. Jur., Gifts, Section 68, as follows:

"It is well settled that a conveyance of land to be valid at law must be by deed under seal, but in equity a good right and title may be given * * * by parol. * . * * a parol gift of land is on the same footing as a parol sale of land, and in order to take a parol gift of land out of the statute of frauds possession must be taken in pursuance of the gift, and as a further condition to the consummation of the equit-

able right and title, the donee must have made improvements of a valuable and permanent character, induced thereto by the promise to give the land. When these conditions and considerations have followed, the performance of the promise, although by parol, can be enforced in equity, and the donee becomes entitled to specific performance. * * * The right to specific performance, after going upon the land and making improvements, is especially favored in the case of a parol gift from a parent to a child.

"Mere possession and the making of some improvements, however, do not dispense with the necessity of producing distinct proof of the principal fact—that is that there was a gift. Even if there actually has been a gift, the donee is not entitled to the aid of equity when the improvements are slight and not of permanent value."

A similar statement of the law governing the enforcement in equity of a parol gift of land will be found in 38 C. J. S., Gifts, § 57.

Of course, the necessity of proving the making of valuable and permanent improvements on the land in reliance upon the gift is more in the nature of equitable estoppel.

When the respondents first sought to introduce testimony tending to prove the parol gift of this land, the appellants objected thereon on the ground that it was incompetent under the statute of frauds, but conceded that such line of testimony would be competent after evidence had been introduced to show performance which would take it out of the said statute. It was understood that this objection to the testimony would continue throughout the reference without being repeated. Thereafter the respondents introduced evidence to prove that they entered into possession of a house, and some land surrounding the house on the 221 acre tract of land, *but as sharecroppers* of W. S. Huggins, the appellants' testate, for the years, 1943 and 1944, the only years they were in the possession of any of the land here involved prior to the death of said W. S. Huggins; and that

while sharecropping this land, the majority of the land claimed having been theretofore cultivated for only two years and was therefore known as "new ground," cut bushes and dug up and removed grubs or roots and stumps, repaired some terraces, and made other inconsequential improvements thereto. No further objection was made, except in one instance, to testimony offered to prove the parol gift, which was probably unnecessary under the continuing objection which had been made, but there was also no motion made at the conclusion of respondents' testimony to strike out such testimony as being inadmissible by reason of the nature of the possession shown. However, the nature of the possession of the respondents and the nature of the improvements made to the land preclude the claim that this possession and the improvements made admissible testimony of a parol gift of the land which was clearly inadmissible under the statute of frauds. And, it follows that if the testimony in behalf of the respondents tending to prove a parol gift from the appellants' testator to the respondent. Nealie Stroud, was inadmissible, then the entire defense of the respondents falls.

But granting the admissibility of the testimony, and giving full weight thereto, it would be a most dangerous precedent to set to hold that the respondents have thereby established a parol gift of the land they claim, or that is the land and premises claimed by the respondent, Nealie Stroud, enforceable by a Court of Equity.

Before further reference is made to the testimony relied upon to establish a parol gift, and its enforceability, it is proper to state that we conclude, as did the Circuit Judge, that Nealie Stroud was the illegitimate daughter of W. S. Huggins; and that she lived in his home and was treated as one of his children from the time she was about four years of age until she was married to the respondent, Calvin Stroud, in November, 1920, at which time she was 19 years of age.

For approximately four years prior to the respondents moving to Patrick, the respondent Calvin Stroud had been working for the W. P. A., and on the Santee-Cooper project, during which time the respondents resided about four miles above Chesterfield. In the latter part of March 1942, they moved to a small house owned by W. S. Huggins at Patrick, and the respondent, Calvin Stroud, commenced to work at a saw mill owned by W. S. Huggins. Throughout the year 1942, or until late in December, the man who had share-cropped the land here in dispute for that year, resided in a house thereon, and was in the possession thereof. Upon his relinquishing the possession in the latter part of December, 1942, the respondents moved thereon, and an agreement was entered into between the respondent Calvin Stroud and W. S. Huggins that said respondent would sharecrop the land. When the respondents moved to Patrick and from Patrick to the land in dispute, W. S. Huggins furnished the truck that moved them, and it was driven by a son of Mr. Huggins.

We quote from the testimony of the respondent, Calvin Stroud:

"Q. After you moved down there, Mr. Stroud, would Mr. Huggins come down? A. He came down there on Sunday.

Q. Sunday after you moved there? A. Yes, sir.

Q. You hear any conversation between him and your wife? * * * A. My wife was standing there. He slapped her on the shoulder and asked her how all of us was getting along and said: 'Well, Nealie, you are at home now, you won't never have to move no more. This house and 60 acres is yours. You won't never have to move any more.'

Q. Did he say anything else about it at that time? A. No, he didn't say anything else about it that time. He hoped we would get along good. He was glad to get her back down there with him again.

Q. Now, Mr. Stroud, in reference to that tract of land did he say anything about it one way or the other about working it?

A. Yes, sir.

Q. What did he say? A. He said that he wanted me to work that piece of land with Brooks for a year or two until he got back some of the money he had in it—getting it in shape for farming—clearing land.

Q. He suggested that you work with Mr. Brooks? A. Mr. Brooks managed it.

Q. Brooks was looking after it for Mr. Huggins? A. Him and Brooks was looking after it.

Q. And he wanted you to sharecrop for a year or two and then it would be hers? A. Yes, sir.

Q. Did you go ahead and work it on that basis? A. Yes, sir.

Q. And you were living there when he died? A. Yes, sir.

Q. That was in 1944? A. Yes, sir.

Q. Your wife considered the lands hers? A. Yes.

Q. Under those conditions? A. Yes.

Q. What kind of work did you do towards improving it? A. We cut a lot of bushes and plowed up lots of grubs and hauled them out and whenever we would find stumps we would dig up stumps—they like a heap of being up now. There's a lots of stumps we got out of there. Cleaned it up and tried to work to make a living.

Q. Preparing the land for cultivation? A. Yes, sir.

Q. When you went there you know how long it had been cleared and worked? A. They said it had been worked two years.

Q. How many acres of land in that new grounds there? A. It is practically all in new ground.

Q. How many acres? A. It's about 35 or 40 I reckon in real new ground land.

Q. In what shape is that land in now? A. It's in fairly good shape.

Q. Growing cotton do you have any trouble? A. Nothing only big stumps— no hitches much in it now—all the little grubs and hitches is pulled out.

Q. Built any pastures? A. We have one pasture down there—cow pasture.

Q. Have you all put it there? A. Yes, sir.

Q. You and your wife? A. Yes, sir.

Q. What about the house up there—what kind of work has been done on the house? A. There has been a room put there—sort of a shed room.

Q. Who had that done? Who did it? A. Mr. Huggins.

Q. State whether or not you helped to build it? A. Yes, sir.

Q. State what Mr. Huggins said about that? A. He told her that he was building her another room so she would be convenient so she wouldn't be scrouged up but he told her that he didn't want to build that kind of a room he wanted to build a better room but the war was going on right then and as soon as the war was over he would build her a better room and fix up the room different.

Q. He was doing that for her? A. That's what he said he was doing it for.

Q. Mr. Stroud, when Mr. Huggins died, after he died you remained on in the house there—been there every since? A. Yes, sir."

Walker Gainey, a witness for the respondents, testified that in 1943, he was living about one-fourth mile from this land, and was present when a survey of a line between the lands of some men by the name of Chisholm and W. S. Huggins was made, and that on this day he heard Mr. Huggins say that he had given his daughter (Mrs. Stroud) sixty acres of land and the house, indicating where the respondent, Nealie Stroud, was living; but said nothing about the boundaries.

Bradley Adams, a witness for the respondents, testified that he knew W. S. Huggins and was a relative, although he didn't know the degree; that while talking to Mr. Huggins one day in Chesterfield Mr. Huggins stated to him that he had bought a big tract of land below Patrick—couldn't get the timber without buying the land—had sawed the timber and had given some of the land to "Cal's wife." This state-

ment was alleged to have been made about one year prior to the death of W. S. Huggins, and the witness could not remember if he ever again saw Mr. Huggins.

Mrs. Agnes Crawford, a daughter of the respondents, who married after the respondents moved to the farm, but continues to reside with them, testified that on the day they moved to Partick, Mr. Huggins was there, and she heard Mr. Huggins tell her mother that he had helped the rest of them (evidently referring to his children) and he was going to help her, and this witness then undertook to repeat the precise words of Mr. Huggins addressed to her mother: "You have your choice now of this lot or 60 acres farm near Cat Pond in and around the house"; that her mother, in reply said that she would rather have the farm as she couldn't make a living on the lot; that on Sunday after the respondents moved to the farm, Mr. Huggins came there, patted her mother on the shoulder and said: "You don't have to move any more"; that the house and 60 acres of land in and around the house was hers; that thereafter Mr. Huggins added a room to the house, telling her mother that the house was not large enough.

The improvements testified to by this witness were the shaping up the yard to the house, the building of terraces around it, setting out some shrubbery, and the picking up of grubs and the removal of stumps from the land under cultivation, which was about 35 acres, around the house and the remainder was allowed to grow up in bushes.

Mrs. Essie Lewis, another daughter of the respondents, but who lived with her parents until she was married the latter part of 1944, testified that on the day the respondents moved to the house at Patrick, Mr. Huggins, who was there when the family arrived, came into the living room after the furniture had been placed, sat down beside her mother, patted her on the shoulder and said:

"Nealie, I have helped them all, now I am going to help you. You have your choice of this lot or the house and 60 acres of land in and around the house."

"Q. Where? A. Down close to Cat Pond.

"Q. What did your mother say about that? A. Mother she studied a little bit—looked like and she said: 'Well, daddy, I don't see a living here in the lot. I believe I would rather have the farm where we all can work' and he said: 'Well, as soon as Wade Parker gets through gathering the crops that he has got planted I will move you in down there.' And as soon as Wade got his crop gathered he sent T. B. (a son) to move us."

This witness further testified that on the Sunday following the moving of the respondents to the farm, Mr. Huggins came there, and said: "Well, Nealie, you won't have to move any more—you are at home. This house and 60 acres of land is yours." And that Mr. Huggins then and there said: "The house is rather small and I will build a room to it."

On cross-examination, when this witness undertook to repeat the precise words used by Mr. Huggins in telling her mother about having her choice as between the two places, etc., she, of course, was unable to do so, although the effect was the same; but she didn't miss the pat on the shoulder.

The improvements testified to by this witness consisted of getting up some stumps, picking up grubs and hauling them from the land, and cutting bushes.

Jim O'Neill, a witness for the respondents, knew nothing of this land until 1946, and in that year he and his boys hauled away three loads of grubs which had been picked up from the land under cultivation; that it is a long time job removing all the grubs from new land.

Jesse O'Neill, a witness for the respondents, testified that the respondents had greatly improved the land farmed by them since being there by picking up grubs and hauling them off. The grubs are plowed up year after year as the land is cultivated.

Lonnie Sellers, a witness for the respondents, was the surveyor who was running the line between the Chisholms and

Huggins, and cutting off a piece of land which W. S. Huggins was giving to his son, Brooks Huggins (probably the 116 acres from the original tract of 327.62). On that day he heard W. S. Huggins say he had given or was going to give all of his children a home, and something about his daughter, too.

Woodrow Chisholm, a witness for the respondents, testified that he lived approximately one-fourth of a mile from the land in dispute; that he knew when the respondents moved to this land; that it was second year new ground then; that it was rough but has been improved a great deal by the cutting of bushes and the removal of grubs; that on the day Mr. Sellers was there surveying he heard W. S. Huggins say he had helped all of his children but Mrs. Stroud, and that he was giving to her or was going to give to her "the house and 60 acres of land."

Two or more additional witnesses testified in behalf of the respondents, the gist of their testimony being that when the respondents moved on this land, it had only been cultivated for two years, was new ground, and rough; that over the years of cultivation it had been greatly improved as to the removal of grubs.

There is also in the record some testimony as to the respondents building a wire fence around a portion of this land as a pasture, but it was shown that there were only two strands of wire, and on one end near or in a branch this "pasture" was not enclosed. This pasture was of no consequence, and certainly not a permanent or valuable improvement.

In the light of the testimony on behalf of the respondents, the vast majority of which it would be next to impossible to contradict by direct testimony, we need mention only two most significant facts, which are (1) that on September 29, 1944, nearly two years after the respondents had moved on the land in dispute, and while the respondent, Calvin Stroud, the husband of the respondent, Nealie Stroud, by virtue of

a share-crop agreement with W. S. Huggins, was occupying a portion or the portion of the tract of land containing 221 acres now claimed under a parol gift by the last named respondent from W. S. Huggins, the said Huggins made and executed his Will and directed that upon his death this farm consisting of 221 acres, more or less, be sold and the net proceeds therefrom be divided equally between his children, naming them; and Mrs. Stroud was not one of the named beneficiaries; and (2) that Brooks Huggins, who looked after this property for his father, W. S. Huggins, undertook to rent this farm to W. H. Parker, who had sharecropped it in 1942, for the year 1943, but Mr. Parker couldn't work the whole place, and Mr. Huggins wouldn't rent him only a small portion thereof, so Mr. Parker moved away. When Mr. Parker told W. S. Huggins he was going to move, Mr. Huggins mentioned that he had a family to go there, but didn't mention anything about Mrs. Stroud.

The testimony on behalf of the respondent, Nealie Stroud (of course her co-respondent, Calvin Stroud, claims no interest in any of the land), is far from clear and convincing that a parol gift of 60 acres of the land of W. S. Huggins, on which there is a residence and outbuildings, was made to her by the said Huggins, and her possession thereof was by reason of a sharecrop agreement between her husband, Calvin Stroud and W. S. Huggins, which agreement was in force at the time of the death of Mr. Huggins. Not only was possession of the land in dispute not taken in pursuance of the gift, but no valuable and permanent improvements were made on this land by the respondents during the lifetime of W. S. Huggins. The only improvements were those which naturally flowed from the cultivation of the land, and such as would ordinarily have been made by a tenant for his own benefit and convenience, that is, for the immediate advantage of the occupant.

Another matter which we have found it unnecessary to discuss is the vagueness and indefiniteness of the location of

the sixty acres of land which the parol gift is alleged to have covered.

By reason of the relationship existing between the alleged donor and the alleged donee, we could probably reach the same conclusion as did the learned Circuit Judge that a parol gift of the house and outbuildings and sixty acres of land immediately surrounding same had been established, if the possession of the respondent, Nealie Stroud, had been in pursuance of the gift, and valuable and permanent improvements had been made thereon, but she and her co-respondent were in the possession of this property by reason of her co-respondent becoming a sharecropper of the alleged donor, the appellants' testate, and with only inconsequential improvements; and when the alleged donor made and executed his Will as late as September 29, 1944, wherein he directed a sale of the entire 221 acres of land, the net proceeds from such sale to be divided among certain beneficiaries named, he thereby refuted any such claim as is now before the Court.

The judgment of the Circuit Court is reversed, and the case is remanded thereto for the procurement of such order or orders as may be necessary to give effect to this opinion.

FISHBURNE, STUKES, TAYLOR, and OXNER, JJ., concur.