570 S.E.2d 535

**James H. SATCHER, III a/k/a Chip Satcher, Appellant,**

v.

**Benjamin Wright SATCHER, in his own right and as Personal Representative of the Estate of James H. Satcher, Sr.; James H. Satcher, Jr.; Satcher Realty, Inc; and Judy Livingston, Respondents.**

**No. 3541.**

Court of Appeals of South Carolina.

Heard June 5, 2002.

Decided Aug. 19, 2002.

Rehearing Denied Oct. 22, 2002.

478

Rebecca G. Fulmer, of Columbia, for appellant.

B. Michael Brackett, of Columbia, respondents.

HEARN, C.J.

James H. Satcher, III (Chip) claims ownership of a farm and residence where he lived with his grandfather, James H. Satcher, Sr. (Grandfather), asserting theories of an oral gift, oral contract to devise, and promissory estoppel. The trial court found Chip failed to prove ownership under any of these theories. We find Chip established entitlement to a portion of Grandfather's property based on promissory estoppel but agree that Chip did not prevail as to the other claimed property. Accordingly, we affirm in part and reverse and remand in part.

## FACTS

After Chip's parents separated when he was fourteen years old, he lived with his grandparents. In 1976, when Chip was twenty, his grandparents separated, and Grandfather and Chip moved to a farmhouse on Slide Hill Road (Slide Hill). Chip's girlfriend and later fiancée, Georgianna Vine (Gigi), moved to Slide Hill in 1987.

In February 1990, Chip began working at the Westinghouse Savannah River Plant. In 1993, he was promoted from a general maintenance employee to a power operator, earning $26,520 per year plus benefits. Nevertheless, Chip left Westinghouse in early 1993 to farm Grandfather's land. At trial, several witnesses testified that Grandfather wanted Chip to work the farm and it was their understanding that Grandfather promised Chip that if he came back to the farm, it would be his.

Chip borrowed money to purchase farm equipment and obtain working capital. Until Grandfather's death, Chip planted crops, cleared new land, installed irrigation, and sharecropped with neighboring farmers. During this time,

Grandfather sold some of his property and leased other portions.

Grandfather died testate in May 1998. The introductory paragraph of the will specifically named Grandfather's two sons, Ben and James Satcher, and nine grandchildren, but no grandchild inherited under the will. Ben was granted the " 'Home Place' in Edgefield County, South Carolina, consisting of the lands on Slide Hill Road, Halford Place, and the Son Jeff Place, all to contain 175 acres, more or less, and also my interest, if any, in the 'Johnson Place'...."—all the land to which Chip believed he was entitled.

On June 3, 1998, Chip filed the first of four notices of *lis pendens* on the property. Later that month, Ben demanded he vacate the property so it could be sold. Chip filed a complaint seeking specific performance for legal title, alleging equitable title passed to him through either a(1) parol gift of the residence and farmland; (2) breach of contract to devise the residence; and (3) promissory estoppel as to the residence and farmland. Lastly, Chip sought a declaratory judgment as to the personal property at Slide Hill; however, this claim was later settled in probate court. Ben answered and asserted various counterclaims including trespass.

A bench trial was held, and the trial court found that Chip had not proved his claim under any of his theories. It also dismissed Ben Satcher's counterclaim for trespass and dissolved Chip's notices of *lis pendens*. This appeal followed.

## STANDARD OF REVIEW AND BURDEN OF PROOF

Chip seeks specific performance of title in property in which he claims equitable title. This remedy sounds in equity. *Ingram v. Kasey's Assocs.*, 340 S.C. 98, 105, 531 S.E.2d 287, 290 (2000); *Wright v. Trask*, 329 S.C. 170, 176, 495 S.E.2d 222, 225 (Ct.App.1997). In equity actions, this court may review the record and make findings based on its view of the preponderance of the evidence. *Townes Assocs. v. City of Greenville*, 266 S.C. 81, 86, 221 S.E.2d 773, 775 (1976). However, we are not required to disregard the findings of the trial judge who saw and heard the witnesses and was in a better position to judge their credibility. *Tiger, Inc. v. Fisher Agro, Inc.*, 301 S.C. 229, 237, 391 S.E.2d 538, 543 (1989).

To prevail under any of these theories and avoid the application of the Statute of Frauds[1], Chip must prove each element by clear, cogent, and convincing evidence. South Carolina case law provides a requirement of clear and convincing evidence for proving a parol gift of land and a contract to devise. *See Brown v. Graham*, 242 S.C. 491, 493, 131 S.E.2d 421, 422 (1963) (holding contracts to make a will "are regarded with suspicion and will not be sustained unless established by definite, clear, cogent and convincing evidence"); *Knight v. Stroud*, 214 S.C. 437, 441, 53 S.E.2d 72, 73 (1949) (giving burden of proof required to establish oral gift). With respect to promissory estoppel in real property cases, the burden is less clearly defined. However, we are instructed by *Knight* that the partial performance exception for an oral gift "is more in the nature of equitable estoppel." 214 S.C. at 442, 53 S.E.2d at 74. We therefore extend this analogy to require the same burden of proof in promissory estoppel cases where real property is claimed.

█ Clear and convincing evidence is that "degree of proof which will produce in the [fact finder] a firm belief as to the allegations sought to be established. Such measure of proof is intermediate, more than a mere preponderance but less than is required for proof beyond a reasonable doubt; it does not mean clear and unequivocal." *Anonymous v. State Bd. of Med. Exam'rs*, 329 S.C. 371, 374 n. 2, 496 S.E.2d 17, 18 n. 2 (1998).

## DISCUSSION

### I. Promissory Estoppel

█ A contract and promissory estoppel are two separate and distinct legal theories. They "are two different creatures of the law; they are not legally synonymous; the birth of one does not spawn the other." *Duke Power Co. v. S.C. Pub. Serv. Comm'n*, 284 S.C. 81, 100, 326 S.E.2d 395, 406 (1985). Our courts recognize a remedy in equity if the claimant can prove: (1) the presence of a promise unambiguous in its terms; (2) reasonable reliance upon the promise by the party to whom the promise is made; (3) the reliance is expected and

---

1. S.C.Code Ann. § 32-3-10 (1991).

foreseeable by the party who makes the promise; and (4) the party to whom the promise is made must sustain injury in reliance on the promise.

*Woods v. State,* 314 S.C. 501, 505, 431 S.E.2d 260, 263 (Ct.App. 1993). The applicability of the doctrine depends on whether the refusal to apply it "would be virtually to sanction the perpetration of a fraud or would result in other injustice." *Citizens Bank v. Gregory's Warehouse, Inc.,* 297 S.C. 151, 154, 375 S.E.2d 316, 318 (Ct.App.1988). Unlike a contract which requires a meeting of the minds and consideration, promissory estoppel looks at a promise, its subsequent effect on the promisee, and in certain cases bars the promisor from making an inconsistent disposition of the property.

A. Slide Hill

█ Chip argues he should receive title to Slide Hill under the theory of promissory estoppel. We agree and find the record proves Chip is entitled to Slide Hill, described as "Parcel No. 1" in his second amended complaint.[2] This tract, as shown on an Edgefield County tax map, contains 83.5 acres and includes a house and pond.

There is ample testimony from several disinterested witnesses that Grandfather promised Slide Hill to Chip. Grandfather's former girlfriend testified that Chip was the favorite grandchild and that Grandfather told her when Chip was working at the Savannah River Plant he wanted Chip "to come back home." After Chip returned, he repeatedly told her that "[t]he house is [Chip's] to do what he wants to do" and when Slide Hill was being remodeled he said, "It doesn't matter to me what they do because it's going to be [Chip's] anyway." Although she could not name with certainty which farmlands Grandfather referenced when describing the property which would eventually be Chip's, she testified that "the land around the house at Slide Hill, we looked at all that. [Grandfather] said he was leaving that to Chip and the house. He said he would be well-fixed." Gigi recalled that Grandfather said on numerous occasions, "It's Chip's house."

---

2. In addition, Chip contends the record reflects the existence of an oral contract to execute a will devising Slide Hill to him. However, in light of our decision on Chip's promissory estoppel argument, we need not reach this issue.

Chris Harper, Grandfather's fishing partner, testified that Grandfather told him he was trying to get Chip to return to the farm. He stated, "If he comes back, I will give him the land and all." Harper approached Grandfather about selling the pond behind the house, but Grandfather responded to his requests by saying, "Well, that pond belongs to Chip. This is Chip's pond and that's Chip's house." Another friend testified that "Mr. Satcher told me on several occasions the house and the farm was Chip's" and that upon visiting Slide Hill Grandfather said, "This is Chip's place." Grandfather's neighbor testified that Grandfather referred to Slide Hill as Chip's house and when he asked Grandfather about whether he had deeded the house to Chip, Grandfather responded, "Old boy, you know he is going to get that." One witness stated "if [Chip] would come back and run it and live at the place, it would be his one day."

Lanyce Hatcher worked at the Savannah River Plant and farmed with Grandfather. Hatcher testified he worked with Chip at the plant and that Grandfather told him he "should talk to Chip. Chip needed to be on the farm with them . . . . and it was going to be his anyway." Hatcher stated that he told Grandfather, "From Chip's point, . . . you haven't given him anything in his name. He's just taking a chance working for you here."

Q: And what was Mr. Satcher's response to that?

A: He told me, "Aw, Chip knows he won't ever have anything to worry about. I will take care of him. He is going to get everything." I said, "Why don't you go on and give him something now, at least give him the house and all. You say you are going to give him that . . . ." he said "Yeah, I sure did that."

Chip's father, James Satcher, testified against his own interest in the estate that "All during [Grandfather's] lifetime, he told me that was Chip's house, that it belonged to him." Additionally, "He told me that [Slide Hill] belonged to Chip, that it was Chip's. If he moved out there, it was his. Daddy was the type of person he [sic] was scared to stay by himself." In light of this testimony, we find clear and convincing evidence of an unambiguous promise by Grandfather to leave Chip Slide Hill.

486

In reasonable reliance on that promise, Chip moved to the house and provided Grandfather with companionship and other services for more than twenty years. In further reliance, Chip gave up his opportunity to purchase a house, investing time and effort in Slide Hill and Grandfather's care. All of this was foreseeable and intended by Grandfather who did not wish to live alone on the property. Additionally, we find that Grandfather's actions during the course of the time Chip lived with him reinforced Chip's reliance on that promise. Grandfather's subsequent inconsistent actions do not weaken Chip's promissory estoppel claim for Slide Hill. *See Furman Univ. v. Waller,* 124 S.C. 68, 87, 117 S.E. 356, 362 (1923) (finding that in the presence of a clear promise, the promisee may make the promise irrevocable by spending money or incurring liabilities in furtherance of the enterprise or undertaking as intended by the promisor). Moreover, we believe it would be an injustice not to apply the doctrine of promissory estoppel here because of the extreme amount of time and energy Chip has expended in reliance on Grandfather's promise. Therefore, we find Chip has proved his claim to Slide Hill and remand this matter for further proceedings consistent with our decision.

B. Farmland

Chip argues he is also entitled to the acres he was farming at Grandfather's death under this theory. We disagree.

Although there was testimony that Chip and Grandfather had some arrangement regarding the farmland, we find insufficient evidence of a specific promise by Grandfather to leave Chip the land he claims. Chip does not seek all of Grandfather's holdings; instead, he seeks only the property he was actively farming. Between the time he left his job and Grandfather's death, Chip gradually cleared and cultivated 698.11 acres of the 1138.35 acres Grandfather owned.

The witnesses described general references to "it" or the farm, but none described Grandfather's promise in terms of the acreage Chip actually farmed. For example, one witness testified Chip was to have "Right there around Slide Hill Road is the only thing I can say, that pond to the house. The other farmland out there, I don't really know." The most telling

evidence of Grandfather's and Chip's understanding comes from Chip's testimony on cross-examination, as quoted in part below:

Q: What did Mr. Satcher say about what farmland was? Did he tell you, did he ever make a statement to you that says, "If you come back and farm parcel one, parcel two, this field, that field, this place, that place"? Did he ever describe it for you?

A: He would—no, not farm. He did not say, "Take this farmland, tract number one or whatever, and do that." He just said the farm. I consider any crops that's planted on land, whether it's peaches, cotton, that is farmland. That is my—that's what you wanted to know I think.

Q: I was asking how he described it. You are telling me he didn't describe it?

A: No.

Q: Other than just saying farmland?

A: He just said farm, that's right.

. . .

Q: And it's unclear in your mind right now as to whether he meant it was going to be yours immediately or going to be yours at some point in the future; isn't that true?

A: I took it the way he said it. The way he said it at the time was when I left Westinghouse if I would do that, it would be mine. I didn't question that. I just took his word for it.

Thus, even Chip was unclear as to the details of the promise. In addition, no other witness testified to any specific promises by Grandfather other than those relating to Slide Hill. Therefore, Chip has not shown by clear and convincing evidence that there was an unambiguous promise that he would receive the property he actively farmed. Accordingly, we find the test for promissory estoppel has not been met with respect to the farmland. *See Woods,* 314 S.C. at 505, 431 S.E.2d at 263.

## II. Oral Gift

Chip also argues the trial court erred in finding he did not prove an oral gift of Slide Hill and the farmland. We disagree.

The trial court found insufficient evidence to avoid the requirement that transfers of land must be in writing. In order to remove a parol gift of land from the Statute of Frauds, the donee must either: (1) take possession of the land and perfect his title to it by adverse possession for the statutory period; or (2) prove sufficient partial performance, such as taking full possession of the property and making permanent and valuable improvements to it. *Brevard v. Fortune*, 221 S.C. 117, 125–26, 69 S.E.2d 355, 358 (1952). However, mere possession of the property with only slight improvements is insufficient to remove an oral gift from the Statute of Frauds. *Barnwell v. Barnwell*, 323 S.C. 548, 557, 476 S.E.2d 492, 498 (Ct.App.1996).

Chip asserts title through sufficient partial performance. He and Gigi testified about their contributions to the farm and household, including improvements to the house. Chip also cleared land and performed other farm maintenance. However, Grandfather continued to pay the larger expenses such as replacing the roof on the house and paying property taxes. The trial court found that Chip's efforts "were not such as would have been made only by an owner. A tenant or permissive user would just as likely have made the same expenditures for his or her benefit without regard to ownership of the house." It also found that Chip's farming activities were "as consistent with a tenant sharecrop arrangement as with ownership. Buying equipment, clearing land, and borrowing money for farm operations are not activities restricted to property owners."

Although evidence in the record suggests a definite intent to give Chip the property, we agree with the trial court that Chip did not prove an oral gift of Slide Hill and the farmland by clear and convincing evidence. Moreover, we agree with the trial court that there was no delivery of the gift. To constitute a gift, there must be an actual or constructive delivery of possession of the property. *Barnwell* at 556,

476 S.E.2d at 497. "There can be no such thing as a parol gift commencing in futuro." *Knight,* 214 S.C. at 441, 53 S.E.2d at 73. Chip's evidence was not clear and convincing as to when or if Grandfather actually gave the property to him. Witnesses testified that Grandfather said everything from "This is Chip's place" to "He is going to get it all anyway." Chip testified that he was shocked that he had not been left the property in the will, which is inconsistent with the theory of an outright gift. Thus, we find Chip had only the expectation of an outright gift.

## III. Mutual Mistake

Chip argues the language of the lease agreement entered by Grandfather invalidates the parties' trial stipulation that there was no writing supporting Chip's claim of ownership and he was entitled to relief from that stipulation under Rule 60(b)(1), SCRCP. We find no error.

Jimmy Forrest leased one of Grandfather's peach orchards. Article IX of the lease reads:

LESSEE shall herewith be given and granted water rights for irrigation by LESSOR and by J.M. (Chip) Satcher, III, *who is also signing herewith as adjoining property owner for use as is needed during the life of this lease and renewal periods.*

(emphasis added).

Chip contends the quoted provision evidences an ownership interest in property and, therefore, conflicts with a stipulation entered into at trial.[3] However, the stipulation covered writings that might bring Chip's claim within the Statute of Frauds, not any written reference to Chip's claim. Therefore, we find there is no conflict between the stipulation and the lease provision.

---

3. As stated by the Defendants' attorney at trial, "We have stipulated previously that there is nothing in writing, either a contract, a memorandum, a deed, nothing in writing that would evidence the claim that [Chip] makes to receive title to the real estate." Chip's counsel agreed that there was no "writing that would pass legal title."

490

## IV. Jury Trial

 Chip argues that he was entitled to a jury trial as of right under Rule 38(a), SCRCP, or in the alternative, a jury trial should have been granted by the trial court pursuant to Rule 39, SCRCP. We find both arguments are without merit.

 Chip's argument under Rule 38(a) is not appealable at this time. Orders affecting the mode of trial affect substantial rights protected by statute [4] and must, therefore, be immediately appealed. *Lester v. Dawson*, 327 S.C. 263, 266, 491 S.E.2d 240, 241 (1997). "Moreover, the failure to timely appeal an order affecting the mode of trial effects a waiver of the right to appeal that issue." *Id.*

 However, Chip also sought a jury trial under Rule 39 which provides, "notwithstanding the failure of a party to demand a jury in an action in which such a demand might have been made of right, the court in its discretion upon motion may order a trial by jury of any or all issues." A decision denying a jury trial based on Rule 39(b) is discretionary and not immediately appealable. *Rowe Furniture Corp. v. Carolina Wholesale Furniture Co.*, 292 S.C. 575, 576, 357 S.E.2d 725, 725 (Ct.App.1987). Therefore, we will consider this argument on its merits.

 Based on the plain language of Rule 39, we will review the trial court's denial of a jury trial on an abuse of discretion standard. An abuse of discretion occurs if a trial court's decision is unsupported by the evidence or controlled by a legal error. *Ledford v. Pa. Life Ins. Co.*, 267 S.C. 671, 675, 230 S.E.2d 900, 902 (1976). Here, Chip did not request a jury trial until after filing his second amended complaint. The trial court denied the request after considering the issues involved, prejudice to Chip, timeliness of the request, the docket, and the reason for Chip's delayed request. It found that transferring the case to the jury docket would not result in the "speedy decision on the issues in the case." In addition to the trial court's findings, we are unable to discern any prejudice to Chip from the denial of a jury trial because the estate's legal counterclaims were dismissed. Accordingly, we find no abuse of discretion.

---

4. S.C.Code Ann. § 14–3–330(2) (1977).

## CONCLUSION

For the foregoing reasons, the decision of the trial court is **AFFIRMED IN PART AND REVERSED AND REMANDED IN PART.**

HOWARD and SHULER, JJ., concur.