633 S.E.2d 917

**J. Carroll RUSHING, Individually and on behalf of Pentaura, Ltd., Inc., Rushing–Marlow Properties, Inc., and Shasta Enterprises, L.L.C., Appellants,**

v.

**Larry A. McKINNEY, Ivan Block and Jefferey J. Weiss, and Pentaura Ltd., Inc., Respondents.**

No. 4142.

Court of Appeals of South Carolina.

Heard Nov. 10, 2005.

Decided July 31, 2006.

J. Richard Kelly and Seann Gray Tzouvelekas, both of Greenville, for Appellants.

Mason A. Goldsmith, of Greenville, for Respondents.

BEATTY, J.

J. Carroll Rushing brought suit against Larry A. McKinney, Ivan Block, Jeffrey J. Weiss, and Pentaura Ltd., Inc. (collectively Respondents) asserting breach of contract, fraudulent inducement, fraud, negligent misrepresentation, breach of good faith and fair dealing, breach of fiduciary duty, promissory estoppel, and equitable estoppel arising out of the operation of Pentaura. After a bench trial, the trial court entered a verdict in favor of Respondents, and Rushing appeals.[1] We affirm.

## FACTS

Pentaura was a business incorporated on October 16, 1995, by McKinney, Block, and Weiss to design, sell, and market high-end contemporary furniture. McKinney, Block, and Weiss were the only shareholders, with McKinney and Block contributing most of the initial capital and Weiss acting as a

---

1. Weiss defaulted below and is not a party to this appeal.

manager. Additional funding was obtained for Pentaura in the form of $500,000 in notes payable to Branch Banking and Trust (BB & T) and personally guaranteed by the three shareholders.

At some point in 1996, Block approached Rushing to invest in Block's separate paint coatings business. Although Rushing was not interested in the paint coatings business, he learned more about Pentaura from Weiss and decided to invest in the company. At that time, Pentaura's balance sheet reflected $500,000 in notes payable to BB & T, $372,309.29 in inventory, a negative total equity, and showed Pentaura was operating at a loss.

On April 23, 1997, Rushing wrote a letter to McKinney and Block indicating the terms under which Rushing would invest in Pentaura. Rushing agreed to make a capital contribution of $350,000 to Pentaura, making him a thirty-two percent owner of the total outstanding capital, provided that: Rushing and Richard Grant, Rushing's personal accountant, would become officers of the corporation; Rushing would assume all financial responsibility and control; and Block would take responsibility for the manufacturing process. An adjusted balance sheet attached to the April letter indicated $150,000 would be deducted from the equity of McKinney and Block to account for Rushing's portion of the BB & T notes. Respondents indicated they agreed with the proposal by signing and returning the letter to Rushing. From that point on, Rushing and Grant ran Pentaura, with Grant making payments on Pentaura's note with BB & T from January 1998 until June 2000.

After Rushing became a shareholder, he learned Pentaura's inventory was $277,781 less than he initially believed. Thus, Pentaura's need for additional funds was greater. He proposed the other shareholders either contribute more to Pentaura or reduce their percentage ownership in the corporation. McKinney and Block both decided to reduce their percentage interest in Pentaura, making Rushing a forty-eight percent shareholder.

The underlying controversy centers on what occurred at a meeting between Rushing, Grant, McKinney, Block and Weiss on February 3, 1998 (the February Meeting). Grant prepared

an agenda with financial information for this meeting, but no one took minutes. According to Rushing, he informed the other shareholders that he would give additional funds to Pentaura if Respondents would agree to be personally responsible for the loans. Rushing testified Respondents did not reply in any way, which led him to believe they had an agreement. On February 20, 1998, Rushing sent a letter (the February Letter) to McKinney, Block, and Weiss "to confirm the agreement" they reached at the February Meeting. Among other topics, the February Letter detailed Pentaura's then-current cash needs and requested a capital contribution of $115,720 from Block, $88,560 from McKinney, and $39,000 from Weiss. McKinney had already submitted his share by the time the letter was written. Nothing in the February Letter confirmed an agreement by the parties for the Respondents to be personally liable for the loans made to Pentaura.

On March 2, 1998, Grant wrote a memorandum to Rushing indicating Block was having serious financial problems. Block confirmed this memorandum with a letter to Rushing on April 3, 1998. Block never paid the requested capital contribution from the February Meeting.

Rushing advanced money to Pentaura from January 1, 1998, to September 24, 2001. Rushing evidenced the advances by a series of one hundred and sixty-six demand notes prepared and executed by Grant on behalf of Pentaura. In December of 2001, a schedule of the loans indicated the total outstanding principal and interest were $4,381,747.38 and $895,950.95, respectively. Each note is payable to Rushing and draws interest at a rate of ten percent.[2] No writing evidences any person or entity (other than Pentaura) as being liable for repayment of these loans.

Pentaura continued to operate at a net loss. On August 18, 1999, Rushing wrote to McKinney, Block, and Weiss indicating he had provided cash funding to Pentaura and had made payments on the BB & T notes. Attached to this letter is an

---

**2.** Although Rushing points out the funds he advanced to Pentaura were borrowed, the "cost" of these funds to Rushing varied between six percent and 8.875 percent, as evidenced by Rushing's credit line summary. Therefore, if Pentaura (or McKinney, Block, and Weiss on its behalf) had repaid the loans, the portions repaid to Rushing would have provided Rushing a profit based on the difference in interest rates.

accounting that details the advances made by Rushing to Pentaura and the pro rata share of these loans for each shareholder. The allocation shows McKinney owed $637,941 and Block owed $856,702. Rushing received no response to this letter. Pentaura continued to make payments on the BB & T notes until June 7, 2000. Grant finally wrote McKinney and Block on August 7, 2000, indicating Rushing had made payments on the BB & T notes. These letters allege that McKinney and Block "were given credit for these notes in determining equity percentages of ownership" between the shareholders when Rushing made his initial contribution. Grant asked that McKinney and Block reimburse Pentaura for these payments.

Pentaura operated at a net loss of $1,043,276.62 during the year 2000. In September 2000, Rushing informed his banker, Barry Maness, that he was going to approach Respondents to determine if they wanted to "retain their ownership interest by putting in their prorata [sic] share of the $3,000,000 which [Rushing] has invested in the company and matching it going forward or by simply getting out by paying off the debt that existed prior to [Rushing's] entry in to the business which is to BB & T." (Maness Memo) On December 19, 2000, Rushing wrote McKinney, Block, and Weiss indicating he was "not prepared to extend further credit to you and Pentaura." Nevertheless, Rushing continued to put money into Pentaura as evidenced by more notes.

On June 28, 2001, Rushing again wrote to McKinney, Block, and Weiss and stated: "I agreed to provide capital in the form of a loan to fund the investments each partner has made. We now need to settle up the pro rata share of this loan as we need to finalize a plan to continue to invest, close the operation, find new partners, or sell out, if possible." Rushing provided a data sheet showing that he had given over $4,000,000 to Pentaura in notes. Of that amount, he contended McKinney owed $987,178.30, Block owed $1,269,298.13, and Weiss owed $282,119.83.

McKinney and Block both responded by letters dated July 20, 2001. McKinney indicated he did not agree to an "out-of-pocket pro rata share of any loans." He indicated he had made "all the intended investment in the company at the time

the investments were made." Block expressed surprise that Rushing was still operating Pentaura, and indicated: "In June of 2000 you told me that you were closing the plant due to poor sales." Block stated that he had refused to make capital contributions twice in the past and that he did not believe himself personally liable for Pentaura's debts. Rushing responded to their letters, asserting that Respondents "knew" that he agreed to "fund Pentaura with loans to be repaid on a pro-rata share of ownership. Never have I heard that you didn't intend to pay me back *or reduce your percentage of ownership.*" (emphasis added).

Rushing filed a complaint on March 1, 2002, an amended complaint on April 10, 2003, and a second amended complaint on April 23, 2003. In his second amended complaint, Rushing asserted causes of action against McKinney, Block, and Weiss for breach of contract, fraudulent inducement, fraud, negligent misrepresentation, breach of good faith and fair dealing, piercing the corporate veil, breach of fiduciary duty, promissory estoppel, and equitable estoppel.[3] Rushing also brought a derivative action on behalf of Pentaura against McKinney, Block, and Weiss, seeking reimbursement for payments made by Pentaura on the BB & T notes. Weiss defaulted. McKinney and Block answered, denying the existence of a contract and any allegations of wrongdoing. They also raised several affirmative defenses, including the statute of frauds, statute of limitations, unclean hands, and a violation of securities laws by Rushing. Furthermore, McKinney and Block asserted a cross-claim against Weiss for his share of the BB & T notes.

The case was tried without a jury in April and May of 2003. The trial court entered an order finding Rushing was not entitled to recover under any of his causes of action against McKinney and Block. In addition, the trial court held the statute of frauds, securities laws, and the statute of limitations would preclude Rushing from recovering under certain causes of action if he had prevailed. This appeal followed.

---

3. In addition, Rushing brought causes of action against Pentaura for rent due to Rushing–Marlow Properties, Inc. and Shasta Property, L.L.C., and for collection on the promissory notes of Pentaura payable to Rushing. The court found Rushing could proceed on the action for rent. The current appeal does not concern the rent cause of action.

## SCOPE OF REVIEW

■ This appeal involves both legal and equitable causes of action. When both legal and equitable causes of action are maintained in one suit, each must be analyzed separately according to its own identity as legal or equitable. *Jordan v. Holt*, 362 S.C. 201, 205, 608 S.E.2d 129, 131 (2005); *Future Group, II v. Nationsbank*, 324 S.C. 89, 97, 478 S.E.2d 45, 49 (1996). "In an action at law, on appeal of a case tried without a jury, the findings of fact of the judge will not be disturbed upon appeal unless found to be without evidence which reasonably supports the judge's findings." *Townes Assocs. v. City of Greenville*, 266 S.C. 81, 86, 221 S.E.2d 773, 775 (1976). "In an action in equity, tried by the judge alone, without a reference, on appeal the [appellate court] has jurisdiction to find facts in accordance with its views of the preponderance of the evidence." *Id.*

■ Rushing asserted causes of action against McKinney and Block alleging breach of contract, fraudulent inducement, fraud, negligent misrepresentation, breach of good faith and fair dealing, and breach of fiduciary duty arising from this alleged contract. These are legal causes of action. *See Electro Lab of Aiken, Inc. v. Sharp Constr. Co. of Sumter, Inc.*, 357 S.C. 363, 367, 593 S.E.2d 170, 172 (Ct.App.2004) ("An action for breach of contract is an action at law."); *Bivens v. Watkins*, 313 S.C. 228, 230, 437 S.E.2d 132, 133 (Ct.App.1993) (applying a legal standard of review on appeal from causes of action alleging fraud, negligent misrepresentation, and breach of fiduciary duty). Therefore, the findings of fact of the trial court will not be disturbed on appeal unless found to be without evidence that reasonably supports the court's findings. *Townes*, 266 S.C. at 86, 221 S.E.2d at 775.

■ However, Rushing also asserted rights under the doctrines of estoppel. "[E]quitable estoppel ... should be tried by the court as an equitable issue." *Gaymon v. Richland Mem'l Hosp.*, 327 S.C. 66, 68, 488 S.E.2d 332, 333 (1997). "The doctrine of promissory estoppel is equitable in nature." *West v. Newberry Elec. Co-op.*, 357 S.C. 537, 541–42, 593 S.E.2d 500, 502 (Ct.App.2004). Therefore, on appeal from these causes of action, we have jurisdiction to find facts in

accordance with our view of the preponderance of the evidence. *Townes,* 266 S.C. at 86, 221 S.E.2d at 775.

## LAW/ANALYSIS

### I. Breach of Contract

Rushing argues a contract arose with Respondents at the February Meeting, and thus, the trial court erred in finding he failed to prove the existence of contract. We disagree.

"For a contract to arise there must be an agreement between two or more parties. There must be an offer, there must be an acceptance, and there must be a meeting of the minds of the parties involved." *Hughes v. Edwards,* 265 S.C. 529, 536, 220 S.E.2d 231, 234 (1975). "A contract is an obligation which arises from actual agreement of the parties manifested by words, oral or written, or by conduct." *Regions Bank v. Schmauch,* 354 S.C. 648, 660, 582 S.E.2d 432, 439 (Ct.App.2003).

Rushing testified that Respondents were silent at the February Meeting when he proposed that they would be responsible for their pro rata share of the money Rushing put into Pentaura. Thus, he stated, they agreed with his proposal. However, Rushing made various allegations concerning the specifics of the alleged agreement with Respondents. Rushing's second amended complaint describes the agreement as one in which "Rushing would advance monies from time to time necessary to fund Pentaura operations in the form of loans with the understanding that in the event Pentaura was unsuccessful, the monies would be treated as loans by [the shareholders] based on the percentage ownership interest of each of them in Pentaura." In his deposition, Rushing stated he "advanced money for other people for capital contributions." Later in the deposition, Rushing said he had not made loans to individuals, but he had put money into Pentaura on their behalf. He also testified in his deposition that the money was "loaned to Pentaura to use as capital." On direct examination, Rushing testified he would loan Respondents "some money to put in their part" with the loans coming due only if Pentaura could not pay them off from earnings. Rushing later testified "[t]his [money] was a loan to Pentaura—no,

it's a loan to the shareholders that Pentaura was using" and "Pentaura was the recipient of the money. My loan of the money was to the shareholders."

Grant and Weiss, who were at the February Meeting, testified that the agreement was that Respondents would "settle up" or "pay the Piper" with Rushing regarding the loans if Pentaura became unsuccessful. Grant admitted that "settle up" was not defined and that the parties had been given options of settling up in the past by making contributions or giving up some percentage of stock.

Respondents denied that anything rendering them personally responsible was proposed or that they agreed to be personally responsible.

The trial court found no oral contract existed because: "(1) the proposal by Rushing, if made, was too vague and uncertain, (2) there was no meeting of the minds, and (3) silence by Defendants McKinney and Block cannot under the present circumstances be deemed acceptance." The record is replete with evidence reasonably supporting the trial court's finding.

We agree with the trial court that it is unclear exactly what the alleged agreement entailed. Rushing alternately asserted the money given to Pentaura was either a loan to the company, a loan to Respondents for Pentaura, or a capital contribution on behalf of Respondents. The February Letter, summarizing what occurred at the February Meeting, failed to mention that Respondents agreed to be personally liable for the notes to Pentaura. Even Rushing's witness, Grant, testified that the agreement to "settle up" was not defined. Further, the summary of Rushing's statements to his banker in the Maness Memo indicate Rushing was seeking alternative relief from Respondents in the form of a pro rata contribution or giving up a percentage of stock. Contrary to Rushing's allegation that Respondents agreed to reimburse him, his July 24, 2001 letters to Block and McKinney indicate that the parties had the option of paying him back or reducing their percentage of stock. Finally, the notes evidencing the money given to Pentaura only hold Pentaura liable for the funds. This evidence reasonably supports the trial court's finding that the agreement as alleged by Rushing was vague and that no meeting of the minds occurred.

It is also unusual that Rushing documented other agreements regarding the shareholders and their relationship to Pentaura, but he failed to document the alleged agreement here. Rushing confirmed the agreement with respect to his entry into Pentaura by letter. Rushing wrote a memorandum to Grant with respect to the February Meeting stating: "Did we get minutes and signatures to show that [McKinney and Block] gave up some ownership? This needs to be documented to avoid any future misunderstanding." The February Letter is the only writing sent to McKinney and Block that memorializes the February Meeting. While it confirms various other agreements and discussions that occurred at the February Meeting, it makes no mention of an agreement for Rushing to loan money to McKinney, Block, Weiss, or Pentaura. In fact, it specifically details Pentaura's cash needs and the requested capital contributions of each shareholder. Rushing testified on direct examination he "thought it was very important . . . if there was any monies put into [Pentaura] or loans made, that there [should be] a clear paper trail that accountants could go in, their accountants, my accountants, court accountants, anybody could go through [the paperwork] . . . to have a basis by which the understanding was made." The lack of a writing evidencing the alleged contract here sits in stark contrast to this pattern.

Finally, the record reveals significant tension existed between the parties at the time the alleged contract occurred. This tension is inconsistent with Rushing's assertion he relied on the silence of McKinney and Block to enter into the contract here. Rushing contended Block did not perform his responsibilities under the April 23, 1997 letter. On May 13, 1997, Block responded to Rushing's inquiries as to why manufacturing was not running properly by indicating Pentaura lacked complete sets of parts. Further tension was added when the South Carolina Department of Health and Environmental Control did not issue a painting permit to Pentaura. Rushing testified that "right after [he] got into this business . . . Pentaura receive[d] letters that came to [his] attention from attorneys . . . demanding payment of back invoices[.]" Rushing also stated customers were getting mad at him. According to Rushing, Block did not undertake to solve any of the problems after Rushing began investing. The problems

climaxed after a physical inventory indicated a $277,781 inventory shortage on the February 28, 1997 balance sheet, which Rushing had relied upon to invest in Pentaura. Block was also upset when his recommendations regarding expensive equipment were not followed. These circumstances reasonably support the trial court's finding that an oral agreement among the shareholders to fund Pentaura is improbable.

The trial court's determination that no contract arose at the February Meeting is reasonably supported by Rushing's inability to articulate the alleged agreement between the parties, Respondents' denial of the existence of the agreement, the lack of a writing evidencing the alleged agreement when Rushing had reduced similar agreements to written form, and the overriding tension between the parties before the alleged agreement occurred.

## II. Estoppel

Rushing argues the trial court erred in failing to grant equitable relief under theories of equitable estoppel and promissory estoppel. We disagree.

### A. Equitable Estoppel

Rushing argues that because Respondents knew Pentaura needed additional funding, he had the right to rely on their silence as assent when he proposed the alleged agreement. Thus, he argues, Respondents are equitably estopped to assert there was no agreement.

"The doctrine of estoppel applies if a person, by his actions, conduct, words or silence which amounts to a representation, or a concealment of material facts, causes another to alter his position to his prejudice or injury." *Hubbard v. Beverly*, 197 S.C. 476, 480, 15 S.E.2d 740, 741 (1941). "Prejudice to the other party is an essential element of equitable estoppel." *Janasik v. Fairway Oaks Villas Horizontal Prop. Regime*, 307 S.C. 339, 344, 415 S.E.2d 384, 387 (1992). With regard to the party estopped, the elements of equitable estoppel are: (1) conduct amounting to a false representation or concealment of material facts, "or, at least, which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party

subsequently attempts to assert;" (2) the intention or expectation that such conduct shall be acted upon by the other party; and (3) actual or constructive knowledge of the real facts. *Southern Dev. Land & Golf Co., v. South Carolina Pub. Serv. Auth.*, 311 S.C. 29, 33, 426 S.E.2d 748, 750 (1993). "As related to the party claiming the estoppel, the essential elements are: (1) lack of knowledge and of the means of knowledge of the truth as to the facts in question, (2) reliance upon the conduct of the party estopped, and (3) prejudicial change in position." *Id.*

The trial court held that the doctrine of estoppel was not available to Rushing because he failed in his corporate duties, had unclean hands,[4] was not justified in relying on McKinney's or Block's silence, and should not have proceeded without a clear, unambiguous written agreement.

■ Rushing did not lack the means of knowledge to discover McKinney's and Block's true intentions with respect to the alleged agreement at the February Meeting, and his reliance on their silence is unreasonable. "One with knowledge of the truth or the means by which with reasonable diligence he could acquire knowledge cannot claim to have been mislead (sic)." *Southern Dev. Land & Golf,* 311 S.C. at 34, 426 S.E.2d at 751. As discussed above, Rushing knew to put agreements in writing in order to avoid later misunderstandings. For example, Rushing testified "[t]wo things I've always thought was very important (sic) .... the second thing if there was any monies put into this thing or loans made, that there was a clear paper trail." Despite this knowledge, Rushing did not get a signed writing evidencing a potentially unlimited line of credit from McKinney and Block to put into a limited liability enterprise. Rushing had ample opportunity to ask McKinney and Block to sign a writing containing the

---

4. The trial court found Rushing had unclean hands because even if the alleged oral agreement existed, it would have meant that Rushing essentially sold either stock or interest in Pentaura's debt without making full disclosures. Thus, the court found, Rushing's actions violated the securities laws in effect at the time. *See* S.C.Code Ann. § 35-1-1210 (Supp.2004) (holding that it is unlawful for a person to omit material facts in connection with the offer or sale of a security). Rushing also raises this issue on appeal. Because we affirm the trial court's order based upon his findings that there was no contract and estoppel did not apply, we decline to address this issue.

terms of the alleged agreement or to memorialize the alleged agreement in a writing addressed to McKinney and Block. Under these circumstances, we hold Rushing did not lack the means necessary to discover the true intentions of McKinney and Block, and Rushing's reliance on the alleged oral agreement or silent acquiescence of McKinney and Block is unreasonable.

### B. Promissory Estoppel

Rushing argues Respondents should be estopped from denying the existence of the agreement because they made promises that induced him into paying Pentaura's operating expenses for years.

 The elements of promissory estoppel are:
(1) the presence of a promise **unambiguous in its terms;** (2) reasonable reliance upon the promise by the party to whom the promise is made; (3) the reliance is expected and foreseeable by the party who makes the promise; and (4) the party to whom the promise is made must sustain injury in reliance on the promise.

*Woods v. State,* 314 S.C. 501, 505, 431 S.E.2d 260, 263 (Ct.App. 1993).

 Rushing failed to show the existence of an unambiguous promise. As discussed above, Rushing could not clearly articulate the terms of the alleged oral contract, including whether the money would be treated as a loan or capital contribution, how much money would ultimately be forwarded to Pentaura, or how Respondents would "settle up." Moreover, as previously discussed, Rushing's reliance on the alleged promise of McKinney and Block is unreasonable in light of the tension between the parties and the ambiguities of the alleged promise. Therefore, Rushing is precluded from recovering on a theory of promissory estoppel.

### CONCLUSION

We hold the evidence reasonably supports the trial court's conclusion that no agreement arose at the February Meeting that would allow Rushing to advance unlimited money to Pentaura on behalf of McKinney and Block. Moreover, Rush-

ing is not entitled to equitable relief based on his advances to Pentaura. For the foregoing reasons, the decision of the trial court is

**AFFIRMED.**[5]

HEARN, C.J., and HUFF, J., concur.

---

5. Rushing also appeals portions of the trial court's order finding that: (1) the alleged agreement violated the statute of frauds; (2) the alleged agreement violated the securities laws; (3) McKinney and Block were not personally liable for the payments made on the BB & T notes; and (4) the statute of limitations barred Rushing's claim on any notes made prior to March 1, 1999. Because we affirm based on the contract and estoppel arguments, we decline to address these additional sustaining grounds.