742 S.E.2d 6

**Clyde and Kathy BARNES, Respondents,**

v.

**James E. JOHNSON, Appellant.**

Appellate Case No. 2010–173767.

No. 5079.

Court of Appeals of South Carolina.

Heard Sept. 11, 2012.

Decided Jan. 30, 2013.

460

462

Oscar W. Bannister, of Bannister & Wyatt, LLC, of Greenville, for Appellant.

Lauren Willoughby Barnwell and Scott Franklin Talley, both of Talley Law Firm, P.A., of Spartanburg, for Respondents.

GEATHERS, J.

In this property matter, heard in equity, James E. Johnson appeals the award of $75,616.17 to Clyde and Kathy Barnes. We reverse.

## FACTS/PROCEDURAL HISTORY

Appellant James E. Johnson (Johnson) and Respondent Clyde Barnes (Barnes) are cousins who previously conducted

informal business transactions together.[1] On August 25, 2003, Johnson purchased an eight-acre tract of property on New Cut Road in Spartanburg with a "dilapidated" house located on it. Johnson purchased the property for $131,733.61; he made a down payment of $30,733.61 and borrowed $101,000 from BB & T. Two days later, Johnson purchased a "fire policy" from Nationwide Insurance Company, insuring the house from loss due to fire and lightning. The policy listed Johnson as the named-insured of the tenant-occupied home and BB & T as the mortgagee.

Concurrent with Johnson acquiring the real property, Clyde and Kathy Barnes were living in Florida and looking for a Spartanburg-area home. Seeing an opportunity for mutual benefit with a previous business partner, Johnson and Barnes agreed that Barnes would, with the intent and possibility of later purchasing the property from Johnson: (1) move to the Spartanburg property; (2) pay for all maintenance, repairs, taxes, insurance, utilities, and the related mortgage in Johnson's name; (3) improve the home and surrounding acreage, at Barnes' discretion and own expense;[2] and (4) be able to purchase the home from Johnson *if* Barnes obtained his own financing. Beyond these general conditions, fundamental terms of their agreement, such as timing, pricing, and even repayment terms, were unclear.[3] In fact, the trial court expressly found "[t]he parties in their testimony disagree as to how the financial arrangements should be handled and as to the exact terms of their agreement."

---

1. Both Clyde and Kathy Barnes are Respondents. Hereinafter, we refer to both Respondents as "Barnes."

2. Notably, the property was then in "very bad condition" and required considerable renovation; over about approximately one year beginning in September 2003, Barnes cleaned and painted the house, and replaced doors, carpeting, the air conditioning unit, and the hot water heater. Barnes also constructed a barn and installed a fence on the premises, which he subsequently dismantled and partially recouped.

3. The trial court's order recognized that both parties agreed "they entered into an oral agreement the intention of which was that Barnes could move into the house and occupy the real property." However, the court also found that beyond this general arrangement, the record is unclear "as to how the financial arrangements should be handled and as to the exact terms of their agreement."

The record also reflects testimony alluding to another, related agreement. Barnes testified about an understanding "to sell the property [to a third party], repay Johnson his portion of the proceeds as far as what he invested in the property, and split the profit." Barnes further described this understanding as an agreement to "split the money." The record, however, is unclear whether the referenced "profit" consisted of capital gains or proceeds of the sale, *i.e.*, "split the money," and whether certain previous contributions (down payments, principal payments, on the mortgage, etc.) should be excluded from, or otherwise accounted for within, any such "profit" calculations. Thus, agreements allegedly existed to either: (1) sell the property to Barnes, whereby he would directly benefit from his related improvements; or (2) sell the property to a third-party with Barnes and Johnson splitting any "profits." Based upon these understandings, Barnes and his wife initially made improvements, beginning in September 2003, and later inhabited the dwelling in 2004.

In July 2005, while Barnes was in arrears as to both utility bills and payments on the mortgage in Johnson's name, a medical emergency necessitated the Barneses' return to Florida. While the home was unoccupied, on July 23, 2005, lightning struck and burned the home beyond repair. Upon finding the home's charred remnants, Barnes retrieved a stove and refrigerator from the debris, removed the fencing, and dismantled the barn he built upon the property.

Thereafter, on October 11, 2005, Johnson used $92,332.12, taken from the $95,000 in insurance proceeds paid to Johnson as the named-insured, to pay off his mortgage held by BB & T. Three days later, Johnson sold the property to Michael McDonald and Jed Aho for $136,000. Johnson did not remit any of these generated funds to Barnes.

On June 19, 2006, Barnes filed this action against Johnson alleging breach of contract, conversion, unjust enrichment and *quasi contract*, and promissory estoppel. Johnson counterclaimed, contending Barnes: (1) was a tenant who had abandoned the property in July 2005—then $2,618.79 in arrears as to rent payments and $470.32 behind on utility bills; and (2) owed Johnson $45,000 for the dismantled and removed barn. Barnes responded that Johnson's counterclaims were barred

by "unclean hands, laches, and estoppel." Prior to trial, however, Barnes withdrew the breach of contract action.

The circuit court conducted a bench trial on October 6, 2008. At trial, Barnes produced receipts for $9,639.59 in materials purchased to improve the home and property. Barnes also asserted he spent approximately $22,000 in building the barn, which he later dismantled and partially removed.

The trial court concluded that Barnes established the promissory estoppel and unjust enrichment claims against Johnson.[4] As to the trial court's finding that promissory estoppel existed, this conclusion only related to the parties' initial agreement that Barnes could live in the house with the possibility of later purchasing the home from Johnson if Barnes obtained adequate financing. The trial court did not address whether promissory estoppel existed due to any reasonable reliance and subsequent damages related to the parties' second agreement—selling the home to a third party and splitting the profits.

The trial court awarded Barnes damages of $75,616.17. The trial court subsequently denied Johnson's motions for a new trial, or alternatively, to alter or amend the judgment. This appeal followed.

## ISSUES ON APPEAL

I. Did the trial court err in finding that Barnes established the elements of quantum meruit and unjust enrichment?

II. Did the trial court err in finding that Barnes established the elements of promissory estoppel?

III. Did the trial court err in calculating damages payable to Barnes?

IV. Did the trial court err in taking judicial notice of the average appreciation of real property in Spartanburg County?

---

4. While the trial court's order concluded the elements of promissory estoppel and unjust enrichment existed, the court did not specifically associate either finding with its subsequent calculation of damages.

## STANDARD OF REVIEW

"In an action in equity, tried by the judge alone, without a reference, on appeal the [appellate court] has jurisdiction to find facts in accordance with its views of the preponderance of the evidence." *Townes Assocs., Ltd. v. City of Greenville*, 266 S.C. 81, 86, 221 S.E.2d 773, 775 (1976) (citing *Crowder v. Crowder*, 246 S.C. 299, 143 S.E.2d 580 (1965)).

> Except where the facts have been settled by a jury, whose verdict has not been set aside, it is the duty of this court in equity cases to review challenged findings of fact as well as matters of law. But such duty on our part does not require that we disregard the findings below, or that we ignore the fact that the trial [j]udge who saw and heard the witnesses is in better position than this court to evaluate their credibility; nor does it relieve the appellant of the burden of convincing this court that the trial [j]udge committed error in his findings of fact.

*Twitty v. Harrison*, 230 S.C. 174, 177–78, 94 S.E.2d 879, 880 (1956) (citations omitted).

## LAW/ANALYSIS

### I. Unjust Enrichment and Quantum Meruit

Johnson contends the trial court erred in finding Barnes was entitled to damages, under a theory of quantum meruit, because Barnes "conferred no benefit to [Johnson] who recognized no benefit and did not retain any benefit." We agree.

The South Carolina Supreme Court explained that quantum meruit is a remedy for unjust enrichment:

> This Court has recognized quantum meruit as an equitable doctrine to allow recovery for unjust enrichment. Absent an express contract, recovery under quantum meruit is based on quasi-contract, the elements of which are: (1) a benefit conferred upon the defendant by the plaintiff; (2) realization of that benefit by the defendant; and (3) retention by the defendant of the benefit under conditions that make it unjust for him to retain it without paying its value.

*Columbia Wholesale Co. v. Scudder May N.V.*, 312 S.C. 259, 261, 440 S.E.2d 129, 130 (1994) (citations omitted).

■ "In a case involving improvements to realty, the measure of recovery in restitution is the difference in the fair market value of the property before and after the improvements." *Niggel Assocs., Inc. v. Polo's of N. Myrtle Beach, Inc.*, 296 S.C. 530, 533, 374 S.E.2d 507, 509 (Ct.App.1988) (citation omitted); *see Stringer Oil Co. v. Bobo*, 320 S.C. 369, 373–74, 465 S.E.2d 366, 369 (Ct.App.1995) (finding the appropriate measure of a defendant's unjust enrichment is not the costs incurred by the plaintiff in making the improvements; rather, it is the value of the plaintiff's improvements to the defendant); *Barrett v. Miller*, 283 S.C. 262, 264, 321 S.E.2d 198, 199 (Ct.App.1984) (confining the monetary value of a defendant's unjust enrichment to the increase in market value of the defendant's real property brought about by the plaintiff's efforts).

In his brief, Johnson asserts:

Nothing in the record supports any claim by the Barnes that this increase in value [$4,266.39] was due to their efforts. The barn built by the Barnes was torn down by the new owners and given to the Barnes to remove. The fences were taken down and also given to the Barnes to remove. In conclusion, the record is bare of any improvements upon which a value has been placed and the lack of any such value leaves the Court to simply speculate.

We agree with Johnson's assertion that Barnes failed to introduce evidence showing that his efforts increased the market value of Johnson's property.

Johnson neither benefited from, nor was enriched by, Barnes' work to improve Johnson's property. Although the parties agreed that Barnes would move onto the property and make improvements, the fire consumed any then-existing potential benefit to Johnson that was attributable to Barnes' efforts. Furthermore, Barnes does not claim that Johnson's receipt of insurance proceeds of $95,000 was in any way related to Barnes' efforts to improve the property: the home was insured by Johnson before Barnes began making repairs; Johnson was the named-insured; the fire was an unanticipated event; Johnson was the policy holder and BB & T was listed on the policy as the mortgagee. "The authorities generally agree that a contract of fire insurance is a personal contract

between the insurer and insured, by which the former undertakes to indemnify the latter for the loss he sustains by fire." *Steinmeyer v. Steinmeyer,* 64 S.C. 413, 420, 42 S.E. 184, 186 (1902).

Additionally, after the fire the then-empty land sold for $136,000, an amount just above its previous purchase price with the dilapidated home of $131,733.61. This provides further support that Barnes' efforts did not benefit Johnson. This modest increase in selling price did not result from Barnes' labors; rather, it is a corollary to the modest inflation the trial court found existed within the surrounding area. Both sales involved: (1) a property without an immediately inhabitable dwelling, and (2) the difference in price being accounted for by inflation in the land's inherent value. Finally, construction of the barn, by Barnes, did not enrich Johnson. Barnes dismantled the entire barn and salvaged a portion of the structure's materials.

For the aforementioned reasons, Barnes failed to show any conferred benefit unjustly enriching Johnson. Accordingly, the trial court erred in awarding recovery under a theory of quantum meruit.

## II. Promissory Estoppel

Johnson also contends the trial court erred in finding Barnes successfully established the elements to recover under promissory estoppel. We agree.

The Supreme Court of South Carolina first used the term "promissory estoppel" in 1981. *Higgins Constr. Co. v. S. Bell Tel. & Tel. Co.,* 276 S.C. 663, 665–66, 281 S.E.2d 469, 470 (1981).[5] In *Higgins,* the court explained the doctrine of promissory estoppel, stating:

[A]n estoppel may arise from the making of a promise, even though without consideration, if it was intended that the

___

5. The court pointed out, however, that the doctrine of promissory estoppel had been applied in *Furman University v. Waller,* 124 S.C. 68, 117 S.E. 356 (1923). There, Waller had pledged $10,000 to Furman University's capital campaign. In reliance on the pledges received, Furman constructed a dormitory. *Id.* at 73, 117 S.E. at 358. The court held that Waller's estate was estopped from refusing to fulfill the pledge. *Id.* at 86–88, 117 S.E. at 363.

promise should be relied upon and in fact it was relied upon, and if a refusal to enforce it would be virtually to sanction the perpetration of fraud or would result in other injustice.

276 S.C. at 665, 281 S.E.2d at 470.

 Under the *Higgins* case and its progeny, the party asserting promissory estoppel must demonstrate: (1) a promise with unambiguous terms; (2) reasonable reliance upon the unambiguous promise; (3) foreseeability of the promisee's reliance; and (4) injury sustained in relying on the promise because of the promisor's inconsistent disposition. *Id.; Davis v. Greenwood Sch. Dist. 50*, 365 S.C. 629, 634, 620 S.E.2d 65, 67 (2005). Notably, neither meeting of the minds nor consideration is a necessary element. *Satcher v. Satcher*, 351 S.C. 477, 484, 570 S.E.2d 535, 538 (Ct.App.2002). Thus, in the interest of equity, the doctrine "looks at a promise, its subsequent effect on the promisee," and where appropriate "*bars the promisor* from making an inconsistent disposition of the property." *Id.* (emphasis added).

Although promissory estoppel is a flexible doctrine that aims to achieve equitable results, it, like all creatures of equity, has limitations. *See Craft v. S.C. Comm'n for Blind*, 385 S.C. 560, 568, 685 S.E.2d 625, 629 (Ct.App.2009) (withholding the equitable remedy from an injury independent from the promisor's inconsistent disposition); *Rushing v. McKinney*, 370 S.C. 280, 295, 633 S.E.2d 917, 925 (Ct.App.2006) (holding absence of clearly articulated terms between parties precludes recovery in promissory estoppel). Specifically, the doctrine's elements represent a balancing between affording a remedy where contract law cannot, and ensuring the doctrine's application is not, itself, an inequity against the party estopped. *See Satcher*, 351 S.C. at 484, 570 S.E.2d at 538–39 (reasoning even absent a meeting of the minds and exchanged consideration, sufficient proof for enforcement still exists if there is an unambiguous promise, reasonable reliance, foreseeability, and related injury); *see e.g., Craft*, 385 S.C. at 564–68, 685 S.E.2d at 627–29 (refusing to apply promissory estoppel to remedy an injury occurring after a blind vendor's reliance upon an unambiguous promise, because the complained of harm resulted independently from the promisor's inconsistent disposition).

To this end, and particularly because promissory estoppel applies without a contract, the promise to be enforced must be unambiguous with clearly articulated, definite terms, while the sustained injury must result from an inconsistent disposition by the promisor. *See Craft*, 385 S.C. at 568, 685 S.E.2d at 629 (holding an injury that would have occurred independent of any inconsistent disposition is beyond promissory estoppel's reach); *Rushing*, 370 S.C. at 295, 633 S.E.2d at 925 (holding that an agreement with unclear terms was ambiguous); *Satcher*, 351 S.C. at 483–84, 570 S.E.2d at 538–39 (refusing to apply promissory estoppel where the promise was unclear and lacked details). Therefore, the presence of either an ambiguous promise or an injury not arising out of the inconsistent disposition precludes promissory estoppel's application, though perceived inequities may exist. *See Craft*, 385 S.C. at 568, 685 S.E.2d at 629 (denying recovery in promissory estoppel for blind vendor who failed to demonstrate injury in reliance upon a promise with a later inconsistent disposition); *Satcher*, 351 S.C. at 486–87, 570 S.E.2d at 540 (finding a promise without details ambiguous, despite evidence of "some agreement regarding [the deceased grandfather's intent to transfer farmland to his grandson]"); *cf. Davis*, 365 S.C. at 634–35, 620 S.E.2d at 68 (precluding recovery in promissory estoppel, despite teachers' reliance upon superintendent's promise of an incentive payment because the payment was conditioned on the school board's approval). Thus, promissory estoppel has broad applicability to prevent injustice, but where a promise is unclear or the alleged harms are unconnected to the inconsistent disposition, the doctrine does not risk imposing its own inequity against the party sought to be estopped.

Consistent with these principles, promissory estoppel is inapplicable to any agreement related to either Barnes' potential purchase of the home (the first alleged promise), or the cousins splitting profits upon sale of the property to a third party (the second alleged promise).[6] Both alleged promises include significant ambiguities related to key terms and, thus,

---

6. The trial court specifically based its finding of promissory estoppel upon the first alleged promise. Nonetheless, the trial court based its damages calculations upon the "increase in the value of the property" "attributable to [Barnes'] improvements," a factor more relevant to the second alleged promise.

lack promissory estoppel's requisite clarity, definiteness, and specificity. Additionally, Barnes' complained-of injury is independent from the alleged inconsistent disposition of the property and, therefore, not sustained in reliance upon any alleged promise. Either of these two findings alone precludes a remedy in promissory estoppel. We now address the presence of ambiguity and lack of an inconsistent disposition causing injury.

### A. Ambiguity

Because one may properly invoke promissory estoppel absent elements typically required for a contract, such as a meeting of the minds or exchanged consideration, the doctrine still requires, by clear and convincing evidence, a "promise unambiguous in its terms." *See Satcher*, 351 S.C. at 483–87, 570 S.E.2d at 538–40 (holding an unclear agreement that lacked details was not shown by clear and convincing evidence to be unambiguous); *Rushing*, 370 S.C. at 295, 633 S.E.2d at 925 (holding that an agreement was ambiguous and not enforceable under promissory estoppel because the party seeking enforcement of the promise "could not clearly articulate [its] terms"). This necessity for unambiguous terms, in the absence of a contract, reflects balancing the availability of an equitable remedy with ensuring the remedy's appropriate application. *See Satcher*, 351 S.C. at 483–84, 570 S.E.2d at 538–39 (stating promissory estoppel requires "a promise unambiguous in its terms" and "[u]nlike a contract, which requires a meeting of the minds and consideration, promissory estoppel looks at a promise [and] its subsequent effect on the promisee").

Consistent with this balancing of interests and the lack of a contract specifically defining the agreement, an inability *"to clearly articulate the terms* of [an] alleged oral contract," including how an existing "capital contribution" would be treated and specifically how the parties "would settle up," renders an agreement ambiguous. *Rushing*, 370 S.C. at 295, 633 S.E.2d at 925; *see Satcher*, 351 S.C. at 487, 570 S.E.2d at 540 (finding, despite testimony that some agreement existed, an unclear, unspecific promise to be ambiguous); *see also* 28 Am.Jur.2d *Estoppel and Waiver* § 52 (2011) ("The promise must be clear and unambiguous and sufficiently spe-

cific so that the judiciary can understand the obligation assumed and enforce the promise according to its terms.").

We find the first alleged promise, whereby Johnson would sell the property to Barnes subsequent to Barnes first procuring his own financing, is ambiguous. Initially, clear and convincing evidence of the selling price does not exist. In Barnes' own attempts to arrange financing, even he was unsure how much principal he needed to borrow to effectuate the purchase; Barnes told the banker, "you'll have to ask [Johnson] *assuming* that, a hundred thousand." Additionally, in response to questioning at trial about the agreed purchase price and related terms, Barnes further testified that he "*assumed* a hundred thousand dollars," in the form of loan proceeds, plus forty-thousand dollars to be paid "*whenever* [he] could." Even if not controverted, such testimony does not evidence a clearly articulated and specific promise unambiguous in its terms. Furthermore, while Johnson does concede that Barnes could have purchased the home from him if Barnes had obtained sufficient financing, Johnson also asserted that he never gave Barnes a price.

In addition to the lack of a definite selling price, uncertainty surrounds other key terms of the agreement. The record also never clearly reveals how or when Barnes intended to repay Johnson's prior capital contributions; when the record does generally refer to these critical terms, the references are entirely based upon assumption.

Although it does appear a general understanding existed that Barnes *could* purchase the home, clear and convincing evidence of several key terms was never clearly articulated by Barnes. Interestingly, even the trial court recognized the record's significant uncertainty and "disagree[ment] as to how the financial arrangements should be handled and as to the *exact terms of the agreement,*" a finding incompatible with the court's subsequent award based upon a theory of promissory estoppel.[7]

We find the record does not reflect an unambiguous promise by Johnson that Barnes could purchase the home. *See Rush-*

---

7. The trial court's specific findings of fact as to the alleged agreement's terms did not include key terms such as purchase price or repayment conditions.

*ing,* 370 S.C. at 295, 633 S.E.2d at 925 (holding an agreement ambiguous because the party seeking enforcement of the promise "could not clearly articulate [its] terms"); *Satcher,* 351 S.C. at 486–87, 570 S.E.2d at 540 (finding an unclear promise without details to be ambiguous, despite testimony of "some agreement regarding [disposition of the subject property]"). Because the first alleged promise is ambiguous, promissory estoppel is an unavailable remedy. *See Rushing,* 370 S.C. at 295, 633 S.E.2d at 925 (holding an agreement with terms not clearly articulated is not enforceable through promissory estoppel).

■■ Similarly, significant ambiguity exists regarding the potentially contingent, second alleged promise that Barnes and Johnson would sell the property to a third party and thereafter split any resulting profits. Regarding this alleged promise, Barnes testified that he would "give a hundred for it," "put 40,000 down, and whenever we sell it, we'll split whatever profits that we get." It is entirely unclear whether this second alleged promise is contingent upon completion of the first alleged promise, *i.e.,* Barnes' purchase of the home with a subsequent resale to a third party, or whether it was a potential course of action completely independent from a prior purchase by Barnes. In fact, the trial court's specific findings of fact made no mention of this promise existing as either an independent promise or as a corollary to the first alleged promise.

Furthermore, at no point is "profit," a key term of this second alleged promise, definite. It is unclear whether profit is to be based upon Johnson's original cost and down payment, whether Johnson's returns would be reduced by any improvements Barnes made, whether Barnes' initial payments on Johnson's loan balance increased Barnes' share of the profits, or whether Barnes' cost-basis, assuming he did first purchase the home, applied to determining total profit and each party's respective share. Given the paucity of evidence on this issue, as well as the vagueness and indeterminate nature of what little evidence does exist, the record does not clearly articulate the alleged second promise to sell the property to a third party and split any generated profits. Thus, even if a general understanding to sell the property to a third party did loosely exist, the second alleged promise's context and central terms

are either ambiguous or entirely undefined. Such uncertainty renders judicial enforcement of the second alleged promise inappropriate. *See Satcher,* 351 S.C. at 483–87, 570 S.E.2d at 538–40 (holding an unclear agreement is not enforceable through promissory estoppel).

Because key terms requisite to bringing either alleged promise within the scope of promissory estoppel are absent, indefinite, or unclear within the record, we hold both alleged promises were ambiguous and, thus, unenforceable.

### B. Injury In Reliance

The final element of promissory estoppel requires demonstrating that the reasonably relying promisee sustains injury due to a disposition inconsistent with alleged promise. *Craft,* 385 S.C. at 568, 685 S.E.2d at 629; *Satcher,* 351 S.C. at 484–85, 570 S.E.2d at 538. Because the doctrine only applies when the promisor's inconsistent disposition harms the promisee, the doctrine does not insure the promisee against all potential external forces acting against the promisee's interest or guarantee realization of an agreement's benefit. *See Craft,* 385 S.C. at 567–68, 685 S.E.2d at 629 (holding where a promisee reasonably and foreseeably relies upon an unambiguous promise, but where the alleged injuries are not caused by the promisor's inconsistent disposition, promissory estoppel does not exist). In order to demonstrate that the injury was sustained in reliance upon an alleged promise, the promisee must show, but for the promisor's inconsistent disposition, the complained-of injury would not have otherwise resulted. *See id.* (holding promissory estoppel is not appropriate when the complained-of harm does not result from the promisor's inconsistent disposition).

For instance, in *Craft,* this court found promissory estoppel inapplicable to a vendor's claim for loss of existing employment, which occurred after the vendor quit his job in reasonable reliance upon an offer of new employment that never materialized. *Id.* There, a canteen vendor, licensed through the Commission for the Blind (Commission), worked at Greenville County Square. *Id.* at 563, 685 S.E.2d at 626. Upon learning more desirable vending sites were available through the Commission, the vendor submitted his bid for a new

location. *Id.* In reliance upon his bid's subsequent acceptance, the vendor resigned from his County Square position. *Id.* at 563, 685 S.E.2d at 626–27. However, the Commission's contract to operate the new location subsequently fell through; thus, the vendor was unable to work the new location. *Id.* at 563–64, 685 S.E.2d at 626–27. Moreover, Greenville County had since closed County Square's canteen. *Id.* at 563, 685 S.E.2d at 627–29. The vendor then sued the Commission, alleging the Commission's promise of new employment reasonably induced him to leave his job at County Square, causing his loss of employment at County Square. *Id.* at 565–68, 685 S.E.2d at 627–29. Although the vendor did reasonably leave County Square in anticipation of an unambiguous agreement, this court concluded the vendor did not "demonstrate that he sustained injury . . . in reliance on the Commission's promise"; he could no longer work there for reasons beyond the Commission's control, and, thus, his unemployed status was not due to the Commission's inconsistent disposition. *Id.* at 568, 685 S.E.2d at 629.

Similarly, the home at issue in the present matter no longer existed following the fire and, thus, as in *Craft,* an external factor, and not any alleged inconsistent disposition, caused the complained-of injury. In fact, the injury claimed by Barnes is even less connected to the alleged inconsistent disposition than was the complained-of injury in *Craft.*

Prior to Johnson selling the then-unimproved property to a third party, an act of nature had already frustrated both alleged mutual agreements. Barnes could no more live in the then-scorched home than could his previous efforts in improving the home later contribute to the unimproved land's value at sale to a third party.[8] Consequently, the fire caused Barnes' injury. Therefore, as in *Craft,* the promisor's actions did not harm the reasonably relying promisee. Because Johnson's sale (alleged inconsistent disposition) of the property did not injure Barnes, Barnes necessarily cannot demonstrate any sustained injury in reliance on the alleged agreements. Thus,

---

8. The trial court found Barnes' efforts "increase[d] the value of the property" at sale to the third party. Any improvements made by Barnes, however, were either destroyed by fire or disassembled by Barnes for removal.

despite Barnes' sympathetic situation, promissory estoppel is an inapplicable remedy.

In summation, Barnes failed to demonstrate either an unambiguous promise or an injury sustained in reliance upon such a promise. The absence of either showing precludes recovery by Barnes in promissory estoppel. Accordingly, the trial court erred in ordering recovery under a theory of promissory estoppel.[9]

## CONCLUSION

Based on the foregoing, the decision of the circuit court is **REVERSED.**

HUFF and THOMAS, JJ., concur.

---

9. In view of our disposition of this case, we need not address appellant's remaining arguments. *See* Rule 220(c), SCACR; *Whiteside v. Cherokee Cnty. Sch. Dist. No. One,* 311 S.C. 335, 340, 428 S.E.2d 886, 889 (1993).