MCDONALD, J.:
*761 **583 In this action seeking ejectment and monetary damages, A&P Enterprises, LLC (A&P) argues the special referee erred in finding SP Grocery of Lynchburg, LLC and Suresh "Sam" Patel (collectively, Respondents) hold an equitable interest in the real property on which Sam operates a liquor store and convenience store (Tommy's Grill). We affirm in part, reverse in part, and remand for any eviction proceedings that may be necessary.
Facts and Procedural History
Kamlesh "Kim" Patel is the sole member of A&P. Payel Suresh Patel, daughter of Sam Patel, is the sole member of SP Grocery. Sam and Kim are brothers.
Sam immigrated to the United States from India in 1979. By the early 1980s, Sam's extended family lived in Chicago with Sam and his wife. In 1989, Sam purchased a store on Willow Grove Road in Lynchburg, South Carolina. Sam's family, along with his parents and his younger brother, Kim, then moved to South Carolina, where the family worked in and lived on the premises of the Lynchburg store. The business grew and eventually the brothers acquired a store in Sumter. Although there is some dispute as to the circumstances, by 1992, Kim was operating the Sumter store as his own. From this point forward, Sam and Kim conducted their own respective businesses and both eventually came to have other stores and investments.
By 2010, Sam owned three parcels of improved real estate in Lynchburg (the Property). On two of these parcels, Sam ran a liquor store and Tommy's Grill. On the third parcel, Sam operated a British Petroleum station (the Gas Station); however, the Gas Station was no longer open at the time of the **584 proceeding before the special referee. On February 16, 2010, First Citizens Bank and Trust Co., Inc., initiated foreclosure proceedings against Sam, demanding judgment in relation to the Property. Thereafter, Sam approached Kim about purchasing the Property; A&P later bought it for $350,001 at a May 9, 2011 foreclosure sale.[1]
After A&P bought the Property, Sam continued to operate Tommy's Grill; however, no rental agreement or writing of any kind exists to confirm the nature of Sam's occupancy. Due to financial difficulties, Sam placed Tommy's Grill in the name of SP Grocery during the summer of 2011. SP Grocery obtained all of the operating, lottery, and alcohol licenses for Tommy's Grill and the liquor store.
After Kim's purchase of the Property at the foreclosure sale, Sam failed to pay rent and other expenses necessary for the continued operation of the liquor store and Tommy's Grill; thus, A&P sued for ejectment and monetary damages. Respondents timely answered and counterclaimed, alleging A&P promised Respondents title to the Property and "that in due reliance upon this promise, [Respondents] expended considerable sums of money and [a] large amount of labor in making numerous improvements to the [Property]." A&P denies the existence of any such promise.
At the hearing before the special referee, Sam and Kim gave conflicting accounts regarding Kim's purchase of the Property and the circumstances of Sam's occupancy. According to Kim, when A&P purchased the Property, Kim told Sam he could continue to operate the liquor store and Tommy's Grill rent-free for six or seven months so that Sam could get back on his feet. Kim testified that he asked and expected Respondents to begin paying monthly rent of $3,750 in May 2012. Kim explained that Respondents were also responsible for taxes, insurance, maintenance, and upkeep. On direct examination, Kim testified he sent several lease agreements to Sam, who refused to sign any of them. On cross-examination, Kim admitted *762 he neither prepared nor presented Sam with a written lease agreement prior to July 10, 2013. **585 Kim denied buying the Property solely to help his brother and testified that he expected a twelve to fifteen percent return on his investment. However, Kim admitted he and Sam had no agreement regarding the sale of the Property or rent payments. According to Kim, the families have had a poor relationship since 1992, and the only time he ever heard from Sam was when Sam needed money.
Kim further claimed A&P paid $3,700 in outstanding property taxes on the Property despite Sam's agreement to pay the taxes. Additionally, on two separate occasions, Sam asked Kim to purchase gasoline for Sam to sell at the Gas Station. Initially, A&P purchased gas for Respondents from Turner Oil. Although Respondents agreed to reimburse A&P $17,415 for this purchase, they had not yet done so at the time of the hearing before the special referee. A&P subsequently incurred approximately $20,000 in costs for gasoline purchased from Southern Gas and Fuel. Kim testified, and the special referee agreed, Respondents still owe A&P approximately $17,000 for this purchase.
Sam's story differs. Sam contends Kim purchased the Property in order to convey it back to Sam, not to rent it to him. Although Kim offered to buy the Property for Sam and title it in Sam's name, Sam insisted on paying Kim back over three to five years. Sam claimed he told Kim not to put the Property in his name until he could repay him. Sam further testified that Kim promised Sam he would be able to buy back the Property and, in reliance on this promise, Respondents made significant property improvements.
Sam testified he never received a written lease agreement from Kim until July 2013. He did not object to making monthly payments but believed Kim should credit any payments toward his purchase of the Property as opposed to classifying them as rent. Further, Sam described a supportive family relationship and testified Kim's purchase of the Property was an example of one family member helping another.
Terrence Wilson, who was acquainted with Kim and Sam for many years, both personally and in a business capacity, explained that he owed fairly substantial sums to both Sam and Kim. Wilson understood that Tommy's Grill was to belong to Sam, and Sam was to reimburse Kim for the purchase of the **586 Property. Wilson testified there was never any discussion of rent payments until Sam and Kim's wives argued over an unrelated matter in early 2013.
Payal Patel[2] testified that although the families did not see each other every week after Kim and his family moved to Sumter, they still visited, ate meals together, attended parties together, and participated in family weddings. She further testified that it was her father's intent to repurchase the Property from Kim and that he would not have made expenditures for improvements to the Property if he did not think he would be able to buy it back.
In an April 17, 2014 order, the special referee granted judgment as follows:
It is ordered, that [Sam] Patel owns an equitable interest in the [the Property], that he cannot be evicted at this time, and that he has the right to purchase the property from A&P Enterprises, LLC according to the terms set forth above, and that he owes the annual real property taxes as an incident of ownership of the equitable interest in this property.
It is further ordered, that A&P Enterprises, LLC is granted judgment against [Sam] Patel in the amount of $17,415, plus prejudgment interest on this sum from May 1, 2012, plus judgment for [the] sum of $17,000, plus prejudgment interest on this sum from the date of January 1, 2014; plus the sum of $7,570.90, without prejudgment interest, for a total monetary judgment of $41,985.90 plus prejudgment interest to be computed as indicated.
The special referee denied A&P's motion to reconsider.
*763 Standard of Review
"[C]haracterization of [an] action as equitable or legal depends on the appellant's main purpose in bringing the action ...." Ins. Fin. Servs., Inc. v. S.C. Ins. Co. , 271 S.C. 289, 293, 247 S.E.2d 315, 318 (1978). "The main purpose of the action should generally be ascertained from the body of the complaint. However, if necessary, resort may also be had to the prayer for relief and any other facts and circumstances which throw light upon the main purpose of the action." Id.
**587 (citation omitted). "In an action at law, the appellate court will correct any error of law, but it must affirm the special referee's factual findings unless there is no evidence that reasonably supports those findings." Linda Mc Co., Inc. v. Shore , 390 S.C. 543, 555, 703 S.E.2d 499, 505 (2010). "In actions in equity referred to a special referee with finality, the appellate court may view the evidence to determine the facts in accordance with its own view of the preponderance of the evidence, though it is not required to disregard the findings of the special referee." Florence Cty. Sch. Dist. No. 2 v. Interkal, Inc. , 348 S.C. 446, 450, 559 S.E.2d 866, 868 (Ct. App. 2002). However, when legal and equitable actions are maintained in one suit,[3] "the court is presented with a divided scope of review, and each action retains its own identity as legal or equitable for purposes of review on appeal." Wright v. Craft , 372 S.C. 1, 17, 640 S.E.2d 486, 495 (Ct. App. 2006).
Law and Analysis
I. Promissory Estoppel
A&P argues the special referee erred in finding Respondents own an equitable interest in the Property because Respondents failed to prove the first two elements of promissory estoppel. We agree.[4]
"Promissory estoppel is a quasi-contract remedy." N. Am. Rescue Prods., Inc. v. Richardson , 411 S.C. 371, 379, 769 S.E.2d 237, 241 (2015). Our courts recognize a remedy in equity if the claimant can prove (1) a promise unambiguous in its terms; (2) reasonable reliance upon the promise; (3) the reliance is expected and foreseeable by the party who makes the promise; and (4) the party to whom the promise is made must sustain injury in reliance on the promise. Satcher v. Satcher , 351 S.C. 477, 483-84, 570 S.E.2d 535, 538 (Ct. App. 2002). "Unlike a contract which requires a meeting of the **588 minds and consideration, promissory estoppel looks at a promise, its subsequent effect on the promisee, and in certain cases bars the promisor from making an inconsistent disposition of the property." Id. at 484, 570 S.E.2d at 538-39.
In Barnes v. Johnson , this court explained that "[a]lthough promissory estoppel is a flexible doctrine that aims to achieve equitable results, it, like all creatures of equity, has limitations." 402 S.C. 458, 469, 742 S.E.2d 6, 11 (Ct. App. 2013) ; see Rushing v. McKinney , 370 S.C. 280, 295, 633 S.E.2d 917, 925 (Ct. App. 2006) (holding absence of clearly articulated terms between the parties precludes recovery in promissory estoppel). "Specifically, the doctrine's elements represent a balancing between affording a remedy where contract law cannot, and ensuring the doctrine's application is not, itself, an inequity against the party estopped." Barnes , 402 S.C. at 469, 742 S.E.2d at 11. "To this end, and particularly because promissory estoppel applies without a contract, the promise to be enforced must be unambiguous with clearly articulated, definite terms, while the sustained injury must result from an inconsistent disposition by the promisor." Id. at 470, 742 S.E.2d at 11. "Therefore, the presence of either an ambiguous promise or an injury not arising out of the inconsistent disposition precludes promissory estoppel's application, though perceived inequities may exist." Id. at 470, 742 S.E.2d at 12. "Thus, promissory estoppel has broad applicability to prevent injustice, but where a promise is unclear or the alleged harms are unconnected to the inconsistent disposition, the doctrine does not *764 risk imposing its own inequity against the party sought to be estopped." Id.
A. Unambiguous Promise
Sam testified, and the special referee found, that Kim made an unambiguous promise to Sam that Sam could repurchase the Property for $355,001. The special referee further found that Kim and Sam contemplated monthly payments (of no less than $3,750) over a period of five years.
Our review of the record reveals that Respondents failed to present any terms as part of an alleged agreement or contract for sale of the Property. See Rushing , 370 S.C. at 295, 633 S.E.2d at 925 (holding absence of clearly articulated **589 terms between parties precludes recovery in promissory estoppel). In fact, the special referee specifically found there was no meeting of the minds as far as the terms or conditions of the alleged contract were concerned. Because there was no meeting of the minds nor any actual terms of an agreement, we are unable to find a promise unambiguous in its terms. See Satcher , 351 S.C. at 483-84, 570 S.E.2d at 538 (explaining the elements of promissory estoppel). Moreover, the special referee erred in finding "an implied promise of up to five years for the payments to be made," because promissory estoppel does not rest on an implied contract. See Higgins , 276 S.C. at 665, 281 S.E.2d at 470 (clarifying that an estoppel may arise from the making of a promise). Accordingly, we find the Respondents failed to establish anything other than a vague promise on the part of A&P to at some point sell the Property to Respondents. See Barnes , 402 S.C. at 470, 742 S.E.2d at 11 ("[B]ecause promissory estoppel applies without a contract, the promise to be enforced must be unambiguous with clearly articulated, definite terms ...."). Thus, we find the evidence insufficient to support a promissory estoppel claim.
B. Reasonable Reliance
Additionally, the special referee found Sam relied on Kim's alleged promise and that his reliance was reasonable. Sam testified he incurred significant expenditures totaling $68,804.30 on the Property in reliance on Kim's promise. In addition to paying for general repairs to the Property, Sam purchased a new HVAC system as well as new gas pumps and walk-in coolers for the convenience store. Payal Patel testified her father intended to repurchase the Property from Kim and would not have made these expenditures had he not thought he would be able to buy it back. However, Kim testified that in addition to rent, Respondents were to be responsible for taxes, insurance, maintenance, and upkeep.
We find Sam's reliance on any alleged promise by Kim was unreasonable in light the ambiguities of the alleged promise. See Rushing , 370 S.C. at 295, 633 S.E.2d at 925 (explaining that appellant's reliance on the alleged promise of the respondents "is unreasonable in light of the tension between the parties and the ambiguities of the alleged promise"); contra Satcher, 351 S.C. at 483-84, 570 S.E.2d at 538-39 (reasoning **590 that even absent a meeting of the minds and exchanged consideration, sufficient proof for enforcement still exists if there is an unambiguous promise, reasonable reliance, foreseeability, and related injury). As set forth above, the alleged promise here was ambiguous-it was devoid of any terms, conditions, timelines, or performance requirements. Therefore, Respondents failed to meet their burden of establishing the reliance element of promissory estoppel, and we reverse the special referee's finding that Respondents could recover under a promissory estoppel theory.
II. Eviction
A&P argues the special referee erred in denying A&P's request for an order evicting Respondents from the Property. We agree.
Under section 27-37-10(A) of the South Carolina Code (2007), "[t]he tenant may be ejected upon application of the landlord or his agent when (1) the tenant fails or refuses to pay the rent when due or when demanded, (2) the term of tenancy or occupancy has ended, or (3) the terms or conditions of the lease have been violated."
Here, Kim testified that in addition to taxes, insurance, maintenance, and upkeep, he expected Respondents to begin *765 making monthly rent payments of $3,750 in May 2012. Although Kim and Sam did not discuss a monthly rental amount when Kim purchased the Property, they both testified that Kim prepared and presented a written lease agreement to Sam on July 10, 2013. However, Sam refused to sign the lease agreement. Sam claimed that while he did not object to making monthly payments toward the amount Kim paid for the Property, he believed the payments should apply towards his purchase of the Property and not be classified as rent. As of the date of oral argument, no payments had been made.
As Sam has not established that Kim ever made an unambiguous promise to sell the Property back to him, and Sam has never paid any rent to Kim for the use of the Property, the special referee erred in denying A&P's request for an order evicting Respondents. Thus, we reverse and remand for the special referee to conduct any eviction proceeding that may be necessary.
**591 III. Unpaid Rent
A&P argues the special referee erred in failing to award it unpaid back rent and prejudgment interest on this unpaid rent. We agree.
"An action based on a theory of quantum meruit sounds in equity." Earthscapes Unlimited, Inc. v. Ulbrich , 390 S.C. 609, 616, 703 S.E.2d 221, 225 (2010). "Absent an express contract, recovery under quantum meruit is based on quasi-contract." Id. "The elements of a quantum meruit claim are: (1) a benefit conferred upon the defendant by the plaintiff; (2) realization of that benefit by the defendant; and (3) retention by the defendant of the benefit under conditions that make it unjust for him to retain it without paying its value." Id. at 616-17, 703 S.E.2d at 225.
Kim moved to the United States and lived with his older brother, Sam, who eventually helped Kim begin his own business. Over the years, Sam has helped Kim financially. During Sam's own financial difficulties, he approached Kim, who subsequently purchased the Property at the foreclosure sale. Despite the absence of a rental agreement or writing of any kind to confirm the nature of Sam's occupancy and use of the Property, Sam continued operating Tommy's Grill. Kim testified that he asked and expected Respondents to begin making monthly rent payments of $3,750 in May 2012. However, Kim neither prepared nor presented a written lease agreement to Sam until July 10, 2013.
For some period of time, Respondents have realized the benefit of rent-free use of the Property, and, absent payment, their retention of this benefit has been unjust. See Earthscapes , 390 S.C. at 616-17, 703 S.E.2d at 225 (setting out the elements of a quantum meruit claim). Thus, we reverse the denial of A&P's quantum meruit claim for unpaid rent and remand for the special referee to calculate an unpaid rent award from the time Kim first presented Sam the proposed lease on July 10, 2013. Likewise, we remand the question of Respondents' counterclaim for expenditures made in maintaining and improving the subject property; A&P's award for unpaid rent should be offset by any award to Respondents for these expenditures. The special referee should further determine **592 whether prejudgment interest on the unpaid rent award is appropriate.
Conclusion
We find the special referee erred in determining Respondents own an equitable interest in the Property and reverse the finding of promissory estoppel. Therefore, we also reverse the special referee's finding and judgment against Sam regarding the property taxes for the Property. Additionally, we reverse and remand for the special referee to conduct such further proceedings as may be necessary to address the question of Respondents' eviction, the unpaid rent award, and any offset to which Respondents may be entitled for their maintenance and improvement expenditures. As for the two gasoline purchases, we affirm the special referee's awards of judgment and prejudgment interest.
AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
LOCKEMY, C.J., and KONDUROS, J., concur.

A&P also bought other property owned by Respondents; that property is not at issue in this appeal.

Payel Patel was dismissed from this matter by consent.

A&P's amended complaint includes claims for ejectment, breach of contract, and quantum meruit; Respondents' counterclaim relies on a promissory estoppel theory.

Because we reverse the special referee's promissory estoppel finding, we must also reverse the property tax finding and remand this question to the special referee for further proceedings.